Present:  All the Justices

GEORGE BITAR, M.D.

v.  Record No. 051891  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        June 8, 2006
WAFA RAHMAN

              FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                      David T. Stitt, Judge

     In this medical malpractice action, we address two

issues: (1) the fact that the plaintiff's only medical

expert witness did not state his opinion to a reasonable

degree of medical probability; and (2) the sufficiency of

the evidence.  Because the defendant did not make a

contemporaneous objection when the medical expert's

testimony was introduced, the defendant's motion to strike

the expert's testimony made at the close of the plaintiff's

evidence was not timely, and the objection was therefore

waived.  Thus, the jury properly considered the expert's

opinion.  With regard to the sufficiency of the evidence,

we conclude that the plaintiff presented sufficient

evidence establishing that the defendant breached the

standard of care and that the breach was a proximate cause

of the plaintiff's injury.  Thus, the circuit court's

judgment in favor of the plaintiff was neither plainly

wrong nor without evidence to support it.  We will

therefore affirm that judgment.

RELEVANT FACTS AND PROCEEDINGS

The appellee, Wafa Rahman, underwent an abdominoplasty, a surgical procedure commonly known as a "tummy tuck."[1]  The appellant, Dr. George J. Bitar, performed the surgery in March 2003.  During an office visit on the day prior to the scheduled procedure, Dr. Bitar made pre-operative markings on Rahman's abdomen in preparation for the surgery.  According to Dr. Bitar, he used those markings as points of reference or guidelines during the surgery so that he would know if he was cutting approximately the same amount of skin from the right and left sides of Rahman's abdomen.  Dr. Bitar indicated that the markings were necessary because tissue moves around when a patient lies on the operating table.

The day following the surgery, Dr. Bitar noted in Rahman's chart that the "[a]bdominal incision [was] healing well."  Two days after the surgery, Dr. Bitar again noted that the "[a]bdominal incision [was] healing well," but he observed a "[s]mall two-by-one centimeter of ischemia" on

---

[1] Rahman also underwent a breast reduction surgical procedure, but this medical malpractice action pertains solely to complications that resulted from the abdominoplasty.

2

Rahman's mid-abdomen.[2]  During the first post-discharge examination, Dr. Bitar stated that the "[i]ncision looked good with [a] small area [of] ecchymosis."[3]  In several follow-up appointments, however, Dr. Bitar had to perform a "minor debridement" of dead or necrotic tissue in order for the wound to heal.  The area of the necrotic tissue eventually measured 18 by 8 centimeters and was caused by a loss of blood supply to Rahman's abdominal flap.  Because of the necrosis, Rahman's wound did not heal until approximately nine months after the surgery.[4]

As a result of the complications Rahman suffered following the abdominoplasty, she filed an amended motion for judgment against Dr. Bitar alleging negligence and lack of informed consent.[5]  Rahman alleged that Dr. Bitar breached the standard of care and was negligent in his

---

[2] Expert witnesses defined the term "ischemia" as a "decrease in blood supply," thereby indicating "signs of blood insufficiency to the tissues."

[3] Expert witnesses defined the term "ecchymosis" as "bruising when [there is] blood under the skin that can cause a bluish, purple area which is sometimes indistinguishable from ischemia" and as "a harbinger of potential skin damage due to loss of blood supply."

[4] The term "necrosis" is defined as the "death of living tissue" that is "affected by loss of blood supply." Webster's Third New International Dictionary 1511 (1993).

treatment of her, thereby causing, among other things, "a non-healing abdominal wound, swelling, . . . mutilation, large irregular scarring and scar tissue."

At trial, Rahman presented testimony from Dr. Elliot W. Jacobs, who qualified as an expert in the field of plastic surgery. Dr. Jacobs had reviewed Rahman's medical records with regard to the abdominoplasty as well as pre-operative and post-operative photographs of Rahman. He had also examined her on two occasions after the surgery. Dr. Jacobs described how an abdominoplasty is performed and discussed the planning and monitoring of the procedure. He explained that, in performing an abdominoplasty, "there is a limit as to how much tissue you can remove or how much you can tighten it before the blood supply to the remaining tissues is compromised. And then, as occurred in this case, the tissues left in place will die due to lack of blood supply." Based on the photographs of Rahman, Dr. Jacobs concluded that Dr. Bitar's pre-operative markings "turned out to be the place where he made his final determination of how much tissue would be removed." Dr. Jacobs explained, however, that a plastic surgeon should not pre-determine how much tissue to remove because an

_____

[5] The circuit court dismissed the count alleging lack of informed consent. That issue is not before us in this

4

abdominoplasty "is an operation in which basically you cut as you go. . . . [T]he proper way to do it is not to draw a line but basically to pull it down [and] cut off what [the] patient gives you."

With regard to Rahman's abdominoplasty, Dr. Jacobs testified that the ecchymosis noted on the second day after surgery was the first warning of a potential problem. The ecchymosis occurred in the area below the "belly button," which is the area "furthest from the predictable blood supply." According to Dr. Jacobs, the subsequent appearance of ischemia in the same area was a "red flag." Once the ischemia manifested, Dr. Jacobs indicated that certain remedial efforts were possible, such as cutting some of the stitches free, but that such efforts were not made with regard to Rahman. Dr. Jacobs did describe how Dr. Bitar had gradually removed the dead tissue by cutting it away until he reached "healthy bleeding tissue."

During cross-examination, Dr. Jacobs was asked whether he believed that Dr. Bitar had removed too much tissue because Dr. Bitar had pre-planned the amount of tissue he would take out during the abdominoplasty. Dr. Jacobs answered, "[y]es," explaining that "[Dr. Bitar] could have resected less tissue; and, in my opinion, I believe

appeal.

5

[Rahman] would not have had this problem." Continuing, Dr. Jacobs testified that, in his 31 years of practice as a plastic surgeon, he had never seen an area of necrosis as large as that sustained by Rahman. Finally, Dr. Jacobs clarified his opinion in the following exchange of questions and answers:

A:   What I am saying is that the apparent predetermination of tissue was a deviation. It should not have been predetermined, at least according to this marking.

Number two, I believe that too much tissue was removed leading to the suturing of the flap under such tension that the blood supply was compromised and the tissue eventually died. That's what I'm saying.

Q:   And if that was not a predetermination of what tissue would be removed but simply a guideline for him and what he did was to undermine it, as you indicated, and he brought the tissue down and trimmed off what was excess over the lower side of the cut, that's what you do, isn't it?

A:   Yes.

Q:   And if he did that, then he didn't breach the standard of care, even if it did break down thereafter?

A:   I believe, again, with a – with a result of this magnitude something went horribly wrong. And it's a matter of judgment as to . . . how much tissue you can safely remove. That comes with experience.

At the close of Rahman's evidence, Dr. Bitar moved to strike Dr. Jacobs' testimony and to enter judgment in favor of Dr. Bitar. He argued that Dr. Jacobs failed to express

6

an opinion to a reasonable degree of medical probability that Dr. Bitar had breached the standard of care and that the breach was the proximate cause of Rahman's injuries. Dr. Bitar emphasized the point that Dr. Jacobs never expressed an opinion to a reasonable degree of medical probability. The circuit court took Dr. Bitar's motion under advisement.

At the close of all the evidence, Dr. Bitar renewed his motion to strike Rahman's evidence and enter judgment in his favor. In support of his motion, Dr. Bitar argued the following:

> [A]t no time was Dr. Jacobs ever asked to express an opinion with reasonable medical certainty with respect to the standard of care.
>
> There is no doubt that he stated that in his opinion Dr. Bitar erred because he planned to remove more tissue and, therefore, preplanned it and did, in fact, upon the execution remove more tissue than he should have removed thereby creating a situation where excess tension was placed upon the abdominal flap resulting in inadequate blood supply to what I guess has been termed as area two or the area below the navel and that as a result . . . that area suffered from ischemia and the death of that tissue leaving a cosmetically displeasing appearance to her lower abdomen.
>
> If he had coupled that with the statement that – with reasonable medical certainty or reasonable medical probability . . . he would have perhaps met the standard of care; but he didn't do that.

7

The circuit court denied the motion, explaining that although "the general rule is that medical expert opinion must be rendered to a reasonable degree of medical probability[,] . . . the appropriate time for [the motion] was at the time the witness offered the opinion[,] . . . not after the opinion is in the record." The circuit court also denied Dr. Bitar's motion to reconsider the denial of his motions to strike Dr. Jacobs' testimony and to strike Rahman's evidence.

The jury then returned a verdict in favor of Rahman and awarded damages in the amount of $20,000. Following the verdict, Dr. Bitar filed a written motion to set aside the jury verdict and to enter judgment as a matter of law in his favor. Dr. Bitar argued that Rahman failed to present expert testimony in three areas: (1) what the standard of care required Dr. Bitar to do with regard to Rahman's surgery; (2) that Dr. Bitar breached the standard of care; and (3) that any such breach was a proximate cause of Rahman's damages. Dr. Bitar also asserted that, to the extent Dr. Jacobs offered an opinion, he did not do so to a reasonable degree of medical probability. The circuit court acknowledged that Dr. Jacobs had not been asked whether his opinion was to a reasonable degree of medical probability. Nevertheless, the circuit court again

concluded that an objection on that basis was untimely. The court also stated Dr. Jacobs had testified that Dr. Bitar had breached the standard of care and that his testimony went beyond "mere possibilities."  Thus, the circuit court denied the motion and entered judgment for Rahman in accordance with the jury verdict.  Dr. Bitar now appeals to this Court.

## II.  ANALYSIS

Dr. Bitar raises two issues on appeal.  He asserts that the circuit court erred by permitting the jury to consider Rahman's medical malpractice claim and by thereafter failing to set aside the jury verdict because: (1) Rahman's expert witness failed to state an opinion to a reasonable degree of medical probability; and (2) Rahman's expert witness failed to present sufficient evidence to establish that Dr. Bitar had breached the standard of care and that the breach was a proximate cause of Rahman's injury.  We will address the issues in that order.

In doing so, we are guided by well-established principles of appellate review.  Armed with a jury verdict approved by the trial court, Rahman stands in "the most favored position known to the law." Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992). She is entitled to have the evidence, and all inferences

9

that may reasonably be drawn from it, viewed in the light most favorable to her.  Norfolk S. Ry. Co. v. Rogers, 270 Va. 468, 478, 621 S.E.2d 59, 65 (2005); Evaluation Research Corp. v. Alequin, 247 Va. 143, 147, 439 S.E.2d 387, 390 (1994).  The judgment of the circuit court will not be set aside unless it is "plainly wrong or without evidence to support it."  Code § 8.01-680; see also Norfolk Southern, 270 Va. at 478, 621 S.E.2d at 65.

In a medical malpractice action, "a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, the plaintiff must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death."  Bryan v. Burt, 254 Va. 28, 34, 486 S.E.2d 536, 539-40 (1997); see also King v. Sowers, 252 Va. 71, 76, 471 S.E.2d 481, 484 (1996) ("[t]he relevant issue . . . is whether the treatment rendered violated the applicable standard of care and whether any such breach of the standard of care was a proximate cause of the plaintiff's injury").  " '[E]xpert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages.' "  Perdieu v. Blackstone Family Practice Ctr.,

Inc., 264 Va. 408, 420, 568 S.E.2d 703, 710 (2002) (quoting Raines v. Lutz, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986)); see also Rogers v. Marrow, 243 Va. 162, 167, 413 S.E.2d 344, 346 (1992). To be admissible, such medical expert testimony must be rendered to a "reasonable degree of medical probability." Pettus v. Gottfried, 269 Va. 69, 78, 606 S.E.2d 819, 825 (2005); see also Spruill v. Commonwealth, 221 Va. 475, 479, 271 S.E.2d 419, 421 (1980) ("[a] medical opinion based on a 'possibility' is irrelevant, purely speculative and, hence inadmissible").

This last principle is central to our consideration of the first issue, whether the circuit court erred by allowing the jury to consider the medical malpractice claim since Dr. Jacobs never expressed his opinion to a reasonable degree of medical probability. Dr. Bitar argues not only that Dr. Jacobs' testimony was based on possibilities instead of probabilities but also that his opinion lacked an adequate factual foundation and did not take into account all the variables that could bear upon the inferences to be drawn from the facts.[6] It is correct

---

[6] According to Dr. Bitar, the variables that Dr. Jacobs did not take into account were other possible causes for the loss of tissue such as hematoma and/or seroma, and the effect of flexing the operating table, Rahman's sleeping and standing positions after surgery, releasing sutures post-operatively, and Rahman's smoking.

that Dr. Jacobs never stated his opinion was based on a reasonable degree of medical probability.  Rahman, however, contends that Dr. Bitar's argument premised on this omission in Dr. Jacobs' testimony is actually an objection that should have been raised contemporaneously with the introduction of Dr. Jacobs' testimony rather than at the close of Rahman's evidence, after her other witnesses had testified.[7]  We agree with Rahman's position.

In Mueller v. Commonwealth, the defendant argued that portions of a forensic pathologist's testimony should not have been admitted because the pathologist expressed opinions that were not stated to a "reasonable degree of medical certainty."  244 Va. 386, 410, 422 S.E.2d 380, 395 (1992), overruled in part on other grounds by Morrisette v. Warden of Sussex I State Prison, 270 Va. 188, 202, 613 S.E.2d 551, 562 (2005).  Because the defendant failed to make a contemporaneous objection during the pathologist's testimony to the admission of objectionable opinions, we refused to consider the argument on appeal.  Mueller, 244 Va. at 410, 422 S.E.2d at 395.

Similarly, in Spruill, a psychiatrist testified that there was a "possibility" that the defendant was insane on

_____

[7] Dr. Jacobs was Rahman's first witness.  She called four other witnesses after Dr. Jacobs testified before

12

the day the crimes at issue were committed.  221 Va. at 479, 271 S.E.2d at 421.  We upheld the trial court's decision refusing to admit the testimony.  Id.  We stated, "[a] medical opinion based on a 'possibility' is irrelevant, purely speculative and, hence, inadmissible."  Id. (emphasis added); accord State Farm Mut. Auto. Ins. Co. v. Kendrick, 254 Va. 206, 208-09, 491 S.E.2d 286, 287 (1997); Fairfax Hosp. Sys. v. Curtis, 249 Va. 531, 535, 457 S.E.2d 66, 69 (1995).  We reached the same conclusion in Pettus, when a doctor's answer to a question "offered an expert opinion that was speculative in nature and inadmissible because it was not stated to a reasonable degree of medical probability."  269 Va. at 78, 606 S.E.2d at 825 (emphasis added); see also Vasquez v. Mabini, 269 Va. 155, 160, 606 S.E.2d 809, 811 (2005) (expert testimony founded upon assumptions having no factual basis is inadmissible, and failure of the trial court to strike such testimony upon a timely motion is error); Countryside Corp. v. Taylor, 263 Va. 549, 553, 561 S.E.2d 680, 682 (2002) ("expert testimony is inadmissible if the expert fails to consider all the variables that bear upon the inferences to be deduced from the facts observed"); John v. Im, 263 Va. 315, 319-20, 559 S.E.2d 694, 696 (2002) (expert testimony

resting her case.

13

is inadmissible if it is based on an inadequate foundation, is speculative, or is founded on assumptions lacking a sufficient factual basis).

In sum, these cases demonstrate that an objection based on the fact that a medical expert's opinion is not stated to a reasonable degree of medical probability, lacks an adequate factual foundation, or fails to consider all the relevant variables challenges the admissibility of evidence rather than the sufficiency of evidence. As this Court, however, has stated, "[a]n objection to the admissibility of evidence must be made when the evidence is presented. The objection comes too late if the objecting party remains silent during its presentation and brings the matter to the court's attention by a motion to strike made after the opposing party has rested." Kondaurov v. Kerdasha, 271 Va. 646, ___, ___ S.E.2d ___, ___ (2006).

In some circumstances, a defect in an expert witness' testimony may not be apparent until the testimony of that witness is completed. Hence, an objection raised at that first opportunity is timely. See Vasquez, 269 Va. at 162, 606 S.E.2d at 812-13 (objection was timely made at the end of a witness' testimony when his reliance on unfounded assumptions became clear); Countryside Corp., 263 Va. at 553, 561 S.E.2d at 682 (objection at the conclusion of an

14

expert's testimony when reliance on erroneous factual premise became apparent was timely raised).  In the present case, however, as is true in most instances, the omission rendering Dr. Jacobs' testimony inadmissible was apparent as specific questions were posed and Dr. Jacobs failed, in answering those questions, to express his opinion to a reasonable degree of medical probability as required by established law.  This defect certainly was obvious by the end of the direct examination.  Consequently, an objection could have, and should have, been made at that time.[8]

The general standards for timely motions to strike the evidence for insufficiency are inapplicable to objections regarding the admissibility of evidence.  As we have previously held: "[a] litigant may not, in a motion to strike [the evidence], raise for the first time a question of admissibility of evidence.  Such motions deal with the sufficiency rather than the admissibility of evidence." Woodson v. Commonwealth, 211 Va. 285, 288, 176 S.E.2d 818, 821 (1970); see also Poole v. Commonwealth, 211 Va. 258, 260, 176 S.E.2d 821, 823 (1970).

Since Dr. Bitar did not move to strike Dr. Jacobs' testimony or raise any objection to its admissibility until

---

[8] In some instances, an objection to the admissibility of evidence can be raised in a pre-trial motion.

15

after Dr. Jacobs was excused and had returned to New York, and the testimony of several other witnesses was presented, the objection was too late.  Although Dr. Bitar couches the first issue as a challenge to the sufficiency of the evidence, it presents only a question regarding the admissibility of Dr. Jacobs' testimony, which was waived because the objection was not timely raised during the trial.[9]  See TransiLift Equip., Ltd. v. Cunningham, 234 Va. 84, 91-92, 360 S.E.2d 183, 187-88 (1987) (if a party does not timely object to the admission of evidence, the objection is waived).

Thus, with regard to the first issue, we conclude that the circuit court did not err by allowing the jury to consider Rahman's medical malpractice claim merely because Dr. Jacobs did not express his opinion to a reasonable degree of medical probability.  Dr. Jacobs' testimony, having been admitted without objection, was properly considered by the jury.

---

[9] Dr. Bitar argues on brief that, if he had to object to the admissibility of Dr. Jacobs' testimony contemporaneously with its introduction, he would be presented with "[a]n untenable dilemma with ethical implications."  He contends that such a rule would alert a plaintiff that the opinion of her only expert was not admissible and that, as a defendant, he would lose the opportunity to move to strike the plaintiff's evidence on the basis that she had not proven a prima facie case.  This argument has no merit.

16

> [I]f a litigant sits by and permits evidence to go to the jury which the court, if it had been objected to, would have excluded, the jury have the right and it is their duty to consider it along with all the evidence and give it such weight as they think it is entitled to.

Id. (quoting Newberry v. Watts, 116 Va. 730, 736, 82 S.E. 703, 705 (1914)).

We now consider the second issue, whether the evidence was sufficient to establish that Dr. Bitar breached the standard of care and that such breach was a proximate cause of Rahman's injury. Our resolution of that issue turns on the testimony of Dr. Jacobs, who was Rahman's only medical expert witness.

In addressing the issue, we are mindful that Dr. Bitar challenged the sufficiency of the evidence at the close of Rahman's evidence, at the close of all the evidence, and in a motion to set aside the jury verdict. The standard of appellate review, however, is the same in each instance.

> [W]here the trial court has declined to strike the plaintiff's evidence or to set aside a jury verdict, the standard of appellate review in Virginia requires this Court to consider whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff.

County of Giles v. Wines, 262 Va. 68, 76 & n.*, 546 S.E.2d 721, 725 & n.* (2001) (Lacy, J., dissenting); see also Lumbermen's Underwriting Alliance v. Dave's Cabinet, Inc.,

17

258 Va. 377, 380-81, 520 S.E.2d 362, 364-65 (1999); Claycomb v. Didawick, 256 Va. 332, 335, 505 S.E.2d 202, 204 (1998); Austin v. Shoney's, Inc., 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997).

Dr. Jacobs opined that Dr. Bitar, in planning and performing the abdominoplasty, breached the standard of care because Dr. Bitar pre-determined the amount of tissue to be removed. Continuing, Dr. Jacobs stated that "too much tissue was removed leading to the suturing of the flap under such tension that the blood supply was compromised and the tissue eventually died." This testimony established a breach of the standard of care by Dr. Bitar and that such breach was a proximate cause of Rahman's injury. See Brown v. Koulizakis, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985) (in a medical malpractice action, the plaintiff must establish that the defendant breached the applicable standard of care and that the negligent acts were a proximate cause of the injury). In other words, Dr. Jacobs' testimony provided credible evidence that supports the jury verdict. "A trial court is authorized to set aside a jury verdict only if it is plainly wrong or without credible evidence to support it." Bussey v. E.S.C. Rests., Inc., 270 Va. 531, 534, 620 S.E.2d 764, 766 (2005).

18

Contrary to Dr. Bitar's argument, Dr. Jacobs did not base his opinion on the fact that Rahman suffered complications after her surgery. Instead, in responding to a question whether Dr. Bitar would have breached the standard of care if he had merely used the pre-operative markings on Rahman's abdomen as a guideline, Dr. Jacobs stated, "I believe . . . with a result of this magnitude something went horribly wrong." Furthermore, in arguing his motion to strike Rahman's evidence at the close of all the evidence, Dr. Bitar acknowledged that Dr. Jacobs opined that Dr. Bitar erred because he pre-planned the amount of tissue to remove and then took out more tissue than he should have, thereby causing excess tension upon the abdominal flap, which resulted in inadequate blood supply, death of the tissue, and "a cosmetically displeasing appearance to [Rahman's] lower abdomen."

Thus, we conclude that the circuit court did not err in refusing to strike Rahman's evidence or to set aside the jury verdict in her favor. We cannot say the judgment was "plainly wrong or without evidence to support it." Code § 8.01-680.

CONCLUSION

Since Dr. Bitar failed to raise a timely objection to the admission of Dr. Jacobs' testimony, the circuit court

19

did not err in allowing the jury to consider Rahman's medical malpractice claim even though Dr. Jacobs never stated his opinion to a reasonable degree of medical probability.  Viewing the evidence in the light most favorable to Rahman, we conclude that Rahman presented sufficient evidence to establish that Dr. Bitar breached the standard of care and that the breach was a proximate cause of her injury.

For these reasons, we will affirm the judgment of the circuit court.

Affirmed.