COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Athey, Chaney and Lorish
Argued by videoconference


KEEFE BUTLER

v.        Record No. 0584-22-2

MARTHA ANN THOMAS STEGMAIER,
 AS THE EXECUTOR OF THE ESTATE OF
 WILLIAM OLIVER HELTON, JR. AND
 IN HER INDIVIDUAL CAPACITY, AND
 WILLIAM KEITH STEGMAIER

OPINION BY
JUDGE CLIFFORD L. ATHEY, JR.
MARCH 28, 2023


FROM THE CIRCUIT COURT OF NEW KENT COUNTY
B. Elliott Bondurant, Judge

William W. Sleeth III (Gregory S. Bean; Gordon Rees Scully
Mansukhani, LLP, on briefs), for appellant.

Daniel R. Quarles (Otey Smith & Quarles, on brief), for appellee
Martha Ann Thomas Stegmaier.


Keefe Butler ("Butler") filed this cause of action in the Circuit Court of New Kent

County ("circuit court") contesting probate of William Helton, Jr.'s ("Helton") March 30, 2017

will ("2017 Will"). Butler also sought production of and admission to probate of Helton's

previous August 6, 2012 will ("2012 Will"). In his complaint, Butler alleged that Martha

Stegmaier ("Martha") exercised undue influence over Helton and breached both her fiduciary

and statutory duties as executor. Butler also sought injunctive relief, an accounting, and to set

aside the pay-on-death provisions in Helton's accounts at Bank of America. Finally, Butler

sought to rescind the will and be awarded his attorney fees. On appeal, Butler contends that the

circuit court erred by: (1) failing to grant his motion to strike the testimony of an expert witness

presented by Martha, (2) failing to grant his objections and motions to strike certain questions

and answers regarding his "live in" girlfriends, (3) granting Martha's renewed motion to strike his claim seeking to set aside the pay-on-death provisions of certain bank accounts, (4) failing to recognize a good faith and probable cause exception to the enforcement of a no contest provision in the 2017 Will, and (5) granting Martha's demurrer to his claim seeking recission of the will and an award of attorney fees. For the reasons to follow, we affirm the circuit court.

## I. BACKGROUND

Helton and his wife Carol were neighbors of Martha and William Stegmaier. Kalle and Keefe Butler are Carol's grandchildren from a previous marriage. Following Carol's death in May 2012, Martha began assisting the eighty-eight-year-old Helton with various tasks.

On August 6, 2012, Helton executed the 2012 Will wherein he bequeathed $40,000 each to his deceased wife's grandchildren, Butler and Kalle. Certain other bequests were also made, and Helton's residuary estate was to be divided between Butler and Kalle. However, on December 22, 2016, Helton subsequently executed a second will ("2016 Will") which reduced the amount of his bequests to $20,000 each to Butler and Kalle. Certain additional bequests were also made including $5,000 each to Martha and William Stegmaier. The 2016 Will also made Martha the beneficiary of Helton's tangible personal property and residuary estate.

Next, on March 30, 2017, Helton executed his third and final will. In the 2017 Will, Helton further reduced the bequest to Butler to $10,000 but maintained the $20,000 bequest for Kalle. In the 2017 Will, Martha and William Stegmaier were again left bequests of $5,000 each, and Martha remained the beneficiary of Helton's tangible personal property and residuary estate. However, for the first time, William Stegmaier was designated as a contingent beneficiary of the residuary estate, and in the event both Martha and William Stegmaier predeceased Helton, Martha's sister Patricia Thomas would receive the residuary estate. Martha was designated executor, her husband contingent executor, and Patricia Thomas executor in the event both

Martha and William Stegmaier predeceased Helton. A "no contest" provision was also inserted in the 2017 Will revoking the interests of any beneficiary who challenged the validity of the will or its provisions.

Prior to his death, Helton maintained various bank accounts at Bank of America and Martha held his power of attorney related to the bank accounts. In July of 2016, Helton jointly titled those accounts in Martha's name, giving her a right of survivorship in the accounts.

Following Helton's death on November 26, 2017, the circuit court admitted the 2017 Will to probate, and Martha qualified as executor of Helton's estate. In response, Butler filed his complaint seeking to impeach the 2017 Will, effect its recission, and establish the 2012 Will. The complaint also sought to set aside the pay-on-death and joint account designations of Martha on the Bank of America accounts, enjoin her from taking any detrimental action with respect to the property of the estate, and recover his attorney fees.[1] Martha demurred to the complaint and filed a counterclaim for a declaratory judgment that Butler had violated the 2017 Will's no contest provision. After conducting a hearing on the demurrer, the circuit court sustained the demurrer as to Butler's claim for recission of the 2017 Will and attorney fees.

During the subsequent five-day jury trial, Martha was permitted, over Butler's objection, to cross-examine him about his "live in" girlfriends. At the conclusion of Butler's case in chief, the circuit court granted Martha's renewed motion to strike the evidence as to Butler's claim seeking to set aside the pay-on-death and joint account designations regarding the Bank of America accounts while denying her motion to strike Butler's evidence in its entirety.

During Martha's case in chief, Sherri Nelson ("Nelson"), an attorney whose practice included wills and trusts, was permitted to testify as an expert witness without objection.

---

[1] Butler also alleged that Martha breached fiduciary duties, but at the close of his case in chief, the circuit court granted Martha's motion to strike the evidence as to that claim. This ruling is not challenged on appeal.

Following her direct examination, Butler cross-examined Nelson before Martha asked some additional questions of her on redirect. The following exchange then occurred:

> [MARTHA'S COUNSEL]: I think the jury gets my point, Judge. I'm just going to stop. And I don't have any other questions of Ms. Nelson. Thank you, Ma'am.
>
> THE COURT: All right.
>
> [BUTLER'S COUNSEL]: Nothing further for her, Your Honor.
>
> THE COURT: All right. Any further need for Ms. Nelson?
>
> [MARTHA'S COUNSEL]: No, sir.
>
> THE COURT: All right. Ms. Nelson, thank you for your attendance today. At this point in time you are free to go. Please do not discuss your testimony with anyone.
>
> [NELSON]: Okay. Thanks.
>
> THE COURT: All right. Thank you.
>
> [MARTHA'S COUNSEL]: Judge, we rest.
>
> THE COURT: All right. Do you want to take a few minutes to see if y'all want to have any rebuttal evidence?
>
> [BUTLER'S COUNSEL]: We are going to have some rebuttal evidence, Your Honor. I know a restroom break would be appreciated as we gather our thoughts for the rebuttal.
>
> THE COURT: Okay.

The circuit court then briefly recessed, and upon resumption of proceedings, Butler moved to strike Nelson's expert testimony for lack of foundation, speculation, failure to consider all variables, improper methods, and unreliability because she had not testified that she held her opinions to a reasonable degree of professional certainty, nor had she reviewed the 31 exhibits attached to a deposition she relied on as a basis for her expert opinions. Although the circuit court initially granted the motion to strike the expert's testimony, the following morning the circuit court reconsidered its ruling sua sponte and denied the motion to strike the testimony based upon the motion to strike not being timely made.

The jury subsequently decided that the 2017 Will was the valid last will of Helton and directed that the 2017 Will be admitted to probate.  Martha then renewed her motion for a declaratory judgment on her counterclaim alleging that Butler had violated the no contest provision in the 2017 Will.  Although Butler acknowledged that the will contest he initiated violated the no contest provision of Helton's 2017 Will, he argued that because he "acted with good faith and probable cause" the no contest provision ought not be enforced against him.  The circuit court subsequently held that Butler had violated the no contest provision in the 2017 Will.  On June 1, 2021, the circuit court entered an order admitting the 2017 Will to probate, revoked the 2017 Will provisions that benefitted Butler, and dismissed any remaining claims.

Butler appealed that decision to the Virginia Supreme Court, and that appeal was dismissed due to the order not being final because it did not completely dispose of Martha's counterclaim.  Subsequently, the circuit court, by final order, held that Martha was "entitled to the judicial declaration she sought" in her counterclaim and incorporated the June 1, 2021 order therein.  Butler appealed the final order to this Court.

## II. ANALYSIS

### A. *Standard of Review*

A circuit court's decision to admit testimony is reviewed for abuse of discretion.  *Jackson v. Jackson*, 69 Va. App. 243, 247 (2018), *aff'd*, 208 Va. 132 (2019).  An appellate court "review[s] a circuit court's decision on a motion to strike in the light most favorable to the non-moving party, and the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'"  *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)).  We review de novo questions of law.  *Yourko v. Yourko*, 74 Va. App. 80, 87 (2021).

- 5 -

Whether a beneficiary has triggered a no contest clause in a will is "a mixed question of law and fact. 'What activity or participation constitutes a contest or attempt to defeat a will depends upon the wording of the "no contest" provision and the facts and circumstances of each particular case.'" *Keener v. Keener*, 278 Va. 435, 441 (2009) (quoting *Womble v. Gunter*, 198 Va. 522, 529 (1956)). "Accordingly, we accord deference to the circuit court's findings of historical fact, but review questions of law de novo." *Id.*

"We examine the circuit court's decision to sustain [a] demurrer under a de novo standard of review because it is a pure question of law." *Wilburn v. Mangano*, 299 Va. 348, 353 (2020) (alteration in original) (quoting *Mark Five Constr., Inc. v. Castle Contractors*, 274 Va. 283, 287 (2007)). A circuit court's decision to award attorney fees is reviewed "under the deferential abuse of discretion standard." *Sobol v. Sobol*, 74 Va. App. 252, 288 (2022).

B. *Butler's objection to Nelson's expert testimony was not timely made.*

Butler contends that the circuit court erred in denying his motion to strike Nelson's testimony. We disagree.

Objections to the testimony of an expert witness on grounds of speculation, reliability, lack of adequate foundation, failure to consider all relevant variables, improper methodology, or failure to offer the opinion with a reasonable degree of professional certainty are objections to the admissibility, not the sufficiency of the evidence. *Bitar v. Rahman*, 272 Va. 130, 138-39 (2006) (citing *Pettus v. Gottfried*, 269 Va. 69, 78 (2005); *Vasquez v. Mabini*, 269 Va. 155, 160 (2005); *Countryside Corp. v. Taylor*, 263 Va. 549, 553 (2002); *John v. Im*, 263 Va. 315, 319-20 (2002)). "[A]n objection to the admissibility of evidence must be made when the evidence is presented. The objection comes too late if the objecting party remains silent during its presentation and brings the matter to the court's attention by a motion to strike made after the opposing party has rested." *Id.* at 139 (quoting *Kondaurov v. Kerdasha*, 271 Va. 646, 655

(2006)). "In some circumstances, a defect in an expert witness' testimony may not be apparent until the testimony of that witness is completed. Hence, an objection raised at that first opportunity is timely." *Id.* at 140 (citing *Vasquez*, 269 Va. at 162; *Countryside Corp.*, 263 Va. at 553). "The general standards for timely motions to strike the evidence for insufficiency are inapplicable to objections regarding the admissibility of evidence." *Id.* "[A] litigant may not, in a motion to strike [the evidence], raise for the first time a question of admissibility of evidence. Such motions deal with the sufficiency rather than the admissibility of evidence." *Id.* (quoting *Woodson v. Commonwealth*, 211 Va. 285, 288 (1970)).

In *Bitar*, the plaintiff called a doctor as an expert witness who failed to testify that he held his opinions to a reasonable degree of medical certainty. 272 Va. at 134-35. The defense made no objection to the admission of the doctor's testimony but at the close of the plaintiff's evidence, made a motion to strike the plaintiff's evidence for the doctor's failure to express his opinions to a reasonable degree of medical certainty. *Id.* at 135-36. The circuit court took this motion under advisement, and the defendant renewed the motion at the close of all evidence. *Id.* at 136. The court then denied the motion, finding it an untimely objection, and on appeal, the Supreme Court affirmed the circuit court's decision. *Id.* at 136, 139.

Here, Nelson was qualified as an expert witness without objection and testified on behalf of Martha. Butler's counsel then cross-examined the expert witness, and Martha's counsel asked some additional questions of Nelson on redirect. Butler's counsel then stated, "[n]othing further for her, Your Honor." Counsel for Martha rested, and Butler's counsel then agreed with the court in granting a recess. Following the recess, Butler's counsel, for the first time, moved to strike Nelson's testimony, arguing that the testimony was inadmissible based on foundational matters the expert failed to state during her testimony. Since any foundational objections to the admissibility of Nelson's testimony were evident by the conclusion of her redirect examination,

- 7 -

we find, consistent with the holding in *Bitar*, that the motion to strike her testimony as inadmissible was simply untimely.

Butler relies on *Vasquez*, 269 Va. 155, and *Countryside Corp.*, 263 Va. 549, for authority to argue his objection to the admissibility of the expert testimony was timely made. However, *Vasquez* merely stands for the proposition that when "the party objecting to flawed expert testimony made no objection while the testimony was being given, but moved to strike at its conclusion, after the flaws had become apparent," he has timely objected. *Vasquez*, 269 Va. at 163. Also, in *Countryside Corp.* the Supreme Court permitted an objection to expert testimony which was not made until the expert's testimony had concluded.

Here, unlike *Vasquez* and *Countryside Corp.*, the grounds advanced for objecting to Nelson's testimony were evident long before she concluded testifying, yet Butler's counsel failed to object until after Nelson was excused from further testimony and Martha rested her case. In fact, following the conclusion of Nelson's testimony, Butler consented to the court releasing the witness from further testimony by stating, "Nothing further for her, your Honor." Butler now contends that he could not have objected any sooner than following the conclusion of the recess. As in *Bitar*, counsel for Butler failed to object to the admissibility of the testimony of an expert witness on the grounds that the opinions were not within a reasonable degree of certainty but delayed doing so until the close of the defendant's evidence. We therefore agree with the circuit court that he failed to timely object and, by failing to do so, waived his objection to the admissibility of Nelson's testimony.

C. *The circuit court did not err in permitting Martha to question Butler regarding his "live in" girlfriends.*

Butler next contends that the circuit court erred by failing to sustain his objections to Martha's questions concerning his "live in" girlfriends and further by failing to grant his subsequent motions to strike his responses thereto. He contends that this evidence was not

relevant or, in the alternative, that the probative value of the evidence was substantially outweighed by unfair prejudice. We disagree.

Virginia Rule of Evidence 2:401 defines relevant evidence as "evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." "Relevant evidence is evidence that has a 'logical tendency, however slight, to prove a fact at issue in the case.'" *Howard v. Commonwealth*, 74 Va. App. 739, 756 (2022) (quoting *Winston v. Commonwealth*, 268 Va. 564, 596 (2004)). Butler contends that when Martha was asked while testifying to identify all the reasons Helton had for reducing his bequest to Butler, she failed to point to Butler's relationships with women. As a result, he contends that both the questions concerning his intimate relationships with women and the evidence adduced therefrom were irrelevant and inadmissible to establish any relevant fact in the case. For support, Butler cites a case from the United States Court of Appeals for the Seventh Circuit where evidence of cohabitation was found irrelevant and excluded. *McClain v. Owens-Corning Fiberglass Corp.*, 139 F.3d 1124, 1128 (7th Cir. 1998). However, we do not find the authority he cites persuasive. In *McClain*, the Seventh Circuit Court of Appeals found that evidence of a plaintiff's cohabitation after her husband's death was irrelevant to her loss of consortium claim. By contrast, this case involves a will contest with the cohabitation in question being a potential factor in the reduction of a bequest to a beneficiary of the will.

Since the jury could have concluded that Helton's opinion of Butler's relationships with women was a factor in explaining Helton's testamentary disposition towards Butler, the evidence was relevant.[2] This potential inference was relevant even if Martha's attention had to be drawn to Butler's cohabitation because she did not identify the "live in girlfriends" as one of the reasons

---

[2] "In order to rebut the presumption [of undue influence], the proponent of the will is required to put forth countervailing evidence tending to prove that the decedent's will was not overborne." *Parson v. Miller*, 296 Va. 509, 527-28 (2018).

for Helton reducing his bequest to Butler. Moreover, since "[w]e may not hold that a circuit court abused its discretion regarding an evidentiary admission unless 'reasonable jurists could not differ' with respect to its admissibility," we cannot find here that the circuit court abused its discretion in concluding that evidence of Butler's cohabitation with women was a relevant subject of inquiry. *Fields v. Commonwealth*, 73 Va. App. 652, 679 (2021) (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 521 (2015)).

Alternatively, Butler argues that even if the evidence of his cohabitation with women was relevant, it should not have been admitted since the probative value of the evidence was outweighed by the unfair prejudice it would engender. "Relevant evidence may be excluded if . . . the probative value of the evidence is substantially outweighed by . . . the danger of unfair prejudice . . . ." Va. R. Evid. 2:403(a). "'[U]nfair prejudice' refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Lee v. Spoden*, 290 Va. 235, 251 (2015). However, "the mere fact that evidence is highly prejudicial to a party's claim or defense is not a proper consideration in applying this balancing test. Rather, a trial court must determine whether the probative value of the evidence is substantially outweighed by its *unfair* or *unduly* prejudicial effects." *Id.* at 252.

Butler offers as persuasive authority an unpublished order of the United States District Court for the Western District of Oklahoma wherein that court exercised its discretion to grant a motion *in limine* seeking to exclude evidence of plaintiff's cohabitation as irrelevant and unfairly prejudicial. *Barnhill v. M.H.F. Inc.*, No. CIV-06-110-T, 2007 WL 9711118, at *2 (W.D. Okla. Nov. 16, 2007). Here, Butler alleges that the jury being made aware that he cohabited with a woman who was not his wife created unfair prejudice against him; however, we cannot find that the circuit court abused its discretion in determining that the probative value of Helton's opinion

of his step-grandson's lifestyle outweighed any prejudicial effect. Moreover, the circuit court was best positioned to weigh the admissibility of the evidence and therefore we will not disturb the circuit court's ruling.

D. *Any error of the circuit court in striking the evidence as to the Bank of America accounts was harmless.*

Butler next contends that the circuit court erred by granting Martha's motion to strike Butler's claim of entitlement to Helton's funds in the Bank of America accounts. Assuming without deciding that the circuit court erred in granting the motion to strike, we find any error harmless.

"No judgment shall be arrested or reversed" "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. Here, Helton held various accounts at Bank of America which pursuant to the terms of the accounts became the property of Martha upon Helton's death by right of survivorship. In addition, the 2017 Will named Martha as recipient of his residuary estate, and the 2017 Will was confirmed by the jury as Helton's valid last will and testament. Thus, even if the jury invalidated Martha's survivorship rights in the Bank of America accounts, Martha would have received the funds in the bank accounts as a part of the residuary of Helton's estate. Therefore, we conclude that "substantial justice" has been reached and find that any error was harmless.

E. *The circuit court did not err in failing to recognize a good faith and probable cause exception to the enforcement of the no contest clause.*

Butler next contends that the circuit court erred in failing to recognize a good faith and probable cause exception to the enforcement of the no contest clause in the 2017 Will and, as a result, contends this Court should reverse the circuit court's declaratory judgment enforcing the no contest clause. We disagree.

- 11 -

Our Supreme Court has long considered a will's no contest clause to be valid and enforceable. *Womble*, 198 Va. at 525. Recognizing the tension between "the societal benefit of deterring the bitter family disputes that will contests frequently engender" and the "ancient maxim that 'equity abhors forfeitures,'" the Court explained that "[w]e have reconciled these competing values by stating that no-contest provisions are simultaneously 'strictly enforced' and 'strictly construed.'" *Hunter v. Hunter*, 298 Va. 414, 424 (2020) (first quoting *Keener*, 278 Va. at 442; and then quoting *Jones v. Guaranty & Indem. Co.*, 101 U.S. 622, 628 (1879)). Butler admits he violated the terms of the no contest provision here but argues that his challenge was made in good faith and based on probable cause that Helton lacked capacity or was otherwise subject to undue influence. While others have made this same argument in the past, no decision has resolved the question to date. *See, e.g.*, *Womble*, 198 Va. at 528 (finding argument waived because it had not been raised in the trial court); *Hunter*, 298 Va. at 425-26 (deciding on other grounds without addressing whether exception applied).

In *Womble*, the Supreme Court discussed the policy considerations in support of and against recognizing a good faith and probable cause exception to the enforcement of *in terrorem* clauses. The outline of that discussion is worth recounting here.

The Supreme Court first noted that "authorities in support" of a good faith and probable cause exception to the enforcement of no contest clauses argue "that a sound public policy demands that the truth of a disputable claim should be ascertained as the law provides, and that since courts are created to administer justice there should be no penalties inflicted upon those who seek their performance of that function." *Womble*, 198 Va. at 525. The concern is that "if a will is actually invalid, a strict and literal application of such [a] 'no contest' clause would tend to prevent the establishment of this fact," and "[t]he persons, who may have been instrumental in

the creation of the invalid document and who were to profit most by its admission to probate, would be provided a helpful cover for their wrongful acts." *Id.*

The Supreme Court noted that some authorities argue that the good faith and probable cause exception should be recognized where the ground for impeaching the will is revocation by a later will:

> These authorities declare that where the contest is based upon the claim of revocation by a later will, the public has an interest in having all the documents properly presented to the court; a person knowing of such instrument has the moral if not the legal duty of presenting the instrument for consideration; it would be against public policy to deter such person from presenting the same if he knew that he would risk the loss of all benefits under the will if he took any action on it.

*Id.* at 526. The Supreme Court observed that "[t]he same authorities" would recognize the exception where the will in question is forged because "the public is interested in the discovery of the commission of the crime of forgery, and such forgery . . . is usually based upon evidence more definite in character than that tending to establish the shadowy lines of demarcation involved in mental capacity, undue influence or fraud." *Id.*

The Court also explained that "authorities of equal dignity" decline to recognize the validity of a good faith and probable cause exception. *Id.* The Supreme Court quotes the reasoning of the Supreme Judicial Court of Massachusetts where it stated:

> The ease with which plausible contentions as to mental unsoundness may be supported by some evidence is also a factor which well may be in the mind of a testator in determining to insert such a clause in his will. Nothing in the law or in public policy, as we understand it, requires the denial of solace of that nature to one making a will. A will contest not infrequently engenders animosities and arouses hostilities among the kinsfolk of the testator, which may never be put to rest and which contribute to general unhappiness. Moreover, suspicions or beliefs in personal insanity, mental weakness, eccentricities, pernicious habits, or other odd characteristics centering in or radiating from the testator, may bring his family into evil repute and adversely affect the standing the community of its members. Thus a will contest may

> bring sorrow and suffering to many concerned. A clause of this
> nature may contribute to the fair reputation of the dead and to the
> peace and harmony of the living. Giving due weight to all these
> considerations, we are unable to bring our minds to the conviction
> that public policy requires that a testamentary clause such as here
> is involved be stamped as unlawful, even if the contestant had
> good grounds for opposing the allowance of the will. It seems to
> us that, both on principle and by weight of authority, this is the
> right result.

*Id.* at 526-27 (quoting *Rudd v. Searles*, 160 N.E. 882, 886 (Mass. 1928)). The Court noted that

these deleterious effects had evidently manifested themselves amongst the family members

litigating the case. *Id.* at 527. After its discourse concerning the arguments for and against

recognition of a good faith and probable cause exception, the Court decided the case on other

grounds and declined to adopt either position. *Id.* at 528.

Butler argues that we should recognize this exception to a no contest clause because it is

the majority rule across our sister states and the better policy outcome, and also because he

believes the exception was well-established at English common law.

Butler counts "36 states [that] have either adopted some version of a good faith or

probable cause exception to such no contest clauses, or set forth a class of legal actions for which

no contest clauses do not apply (with two states holding that such clauses are unenforceable)."

*See also* Gus G. Tamborello, *In Terrorem Clauses: Are They Still Terrifying?*, 10 Estate Plan'g

& Cmty. Prop. L.J. 63, 98, app. (2017) (identifying 32 states as recognizing some form of

exception and 5 holding at least some no contest clauses are unenforceable). Indeed, the

Restatement (Third) of Property and the Uniform Probate Code both recognize a good faith

exception.[3] Notably, however, the majority of the states recognizing such an exception do so by

---

[3] *See* Restatement (Third) of Property, *Wills and Donative Transfers* § 8.5 (2003) ("A provision in a donative document purporting to rescind a donative transfer to, or a fiduciary appointment of, any person who institutes a proceeding challenging the validity of all or part of the donative document is enforceable *unless probable cause existed for instituting the*

statute. *See* Tamborello, *supra*, at 98-99, app. (identifying 23 states with statutes establishing an exception).

Butler also asserts that the reasons enumerated in *Womble* in favor of recognizing an exception are more compelling than those it listed against. He argues that times have changed since the Court's considerations in 1956 and that now the concern for familial harmony, happiness, and reputation is less significant than it was 70 years ago. He argues that conversely, the reasons supporting recognition of the exception have grown in importance. He represents to the Court that elder abuse and exploitation is a greater problem now than it was decades ago and therefore concludes that there is a strong need for allowing an exception to the enforcement of no contest clauses. He invites this Court to consider a hypothetical situation in which an elder abuser uses improper influence to obtain a beneficial will including a no contest clause and then "hide[s] behind the safety of the no contest clause" because other beneficiaries are unwilling to risk their legacies to hold the wrongdoer accountable.

At present, there is no statutorily created good faith and probable cause exception to enforcement of no contest clauses in Virginia. Ultimately, it is the role of the General Assembly to evaluate and adopt or discard particular public policy changes as the elected representatives of Virginians directly accountable to the citizenry. Hence, we decline to adopt a good faith and probable cause exception based on policy considerations.

Absent any statute or Virginia caselaw recognizing a good faith exception to no contest clauses, Butler argues that the English common law recognized such an exception and asks us to apply that exception. Code § 1-200 states, "The common law of England, insofar as it is not

---

*proceeding*." (emphasis added)); Unif. Prob. Code § 3-905 (2019) ("A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable *if probable cause exists* for instituting proceedings." (emphasis added)).

repugnant to the principles of the Bill of Rights and Constitution of this Commonwealth, shall continue in full force within the same, and be the rule of decision, except as altered by the General Assembly." Butler relies on two English chancery cases *Powell v. Morgan*, 23 Eng. Rep. 668; 2 Vern. 90 (1688), and *Morris v. Burroughs*, 26 Eng. Rep. 253; 1 Atk. 397 (1737).

We note continuing uncertainty about whether 1776 or 1792 "fixes the date of the Commonwealth's adoption of English common law." *White v. United States*, 300 Va. 269, 277 n.5 (2021). However, we need not resolve that question today as both cases Butler cites as persuasive were decided before either date.

Yet, straightforward analysis is frustrated by uncertainty about whether the English law of equity is contemplated by Code § 1-200's use of the term English "common law" such that English equity cases also provide rules of decision. This question as to whether equity is included in Code § 1-200's use of the term common law has not been answered by our Supreme Court, and it appears open to debate. *See* Stuart A. Raphael, *What is the Standard for Obtaining a Preliminary Injunction in Virginia?*, 57 U. Rich. L. Rev. 197, 206-14 (2022) (discussing the historical arguments for and against understanding Code § 1-200 to have included equity in the adoption of common law). If Code § 1-200 does include equity in its use of the term "common law" then English chancery decisions could constitute binding authority, but if it does not, then English chancery decisions could be at most persuasive authority. Equity and common law were understood as different bodies of law in the 18th century,[4] and we are not prepared to conclude either that equity is or is not included in Code § 1-200's adoption of English common law.

---

[4] In England, equity was a distinct body of law separate from the common law. *See* W. Hamilton Bryson, *The Merger of Common-Law and Equity Pleading in Virginia*, 41 U. Rich. L. Rev. 77, 77-78 (2006) ("The English common law and equity are separate bodies of substantive law, although they are interconnecting[,]" and "the Court of Chancery . . . was primarily a court of equity, but it had a limited common-law jurisdiction in matters involving litigation against officers of the King."); *see also* 3 William Blackstone, *Commentaries* \*429-455 (generally surveying equity and clearly treating it as distinct from common law).

We find it unnecessary to resolve this question however, because *Morris* and *Powell*

simply do not stand for the rule Butler claims they do.  Where "immense scholarly effort" and

"English jurists, legal historians, and commentators have concluded" a particular principle

existed in English common law, we will apply it as the law in Virginia.  *White*, 300 Va. at 285,

287.  *Powell* and *Morris* fail to establish that a good faith and probable cause exception to no

contest clauses is a "longstanding" feature of English common law.

Powell provides but scant support for Butler's position, and *Morris* provides no support.

In *Powell*, a will included a no contest clause, and the plaintiff lost a suit at equity challenging

said will.  The opinion states: "[t]here was *probabilis causa litigandi*, and it was not a forfeiture

of the legacy."  23 Eng. Rep. at 668; 2 Vern. at 91.  The opinion is bereft of any reasoned

analysis articulated in support of its conclusion, and we therefore do not find it persuasive.  In

*Morris*, the plaintiffs successfully challenged a will containing a no contest clause, and plaintiffs

then took from the estate "subject to the custom of London," rather than by the will.  26 Eng.

Rep. at 256; 1 Atk. at 404.  *Morris* therefore presents a fundamentally different scenario easily

distinguished from the outcome here where Butler lost the will contest yet still desires to benefit

from the will despite the existence of the no contest clause.  The inapposite factual and

procedural situation makes it impossible to find that the decision in *Morris* could provide the

basis for a good faith and probable cause exception.

We are also not the first court to attempt to divine whether *Powell* and *Morris* set forth an

established tradition of applying a probable cause exception to no contest clauses.  In

*Smithsonian Inst. v. Meech*, 169 U.S. 398, 413-14 (1898), the Supreme Court concluded, after

reviewing these and other cases, that English common law applied a probable cause exception

- 17 -

where there was no "gift over" provision in the will.[5]  A "gift over" or a "bequest over" is a clause in a will that operates to change a bequest to a different beneficiary if a particular condition set out in the will is met or violated.  Without a "gift over," an *in terrorem* clause was a mostly empty threat.[6]  Thus, so long as a disgruntled beneficiary had probable cause, they could challenge the will without consequence.[7]

Thus, even if England recognized an exception for challenges based on probable cause in certain circumstances, the exception would not apply here where the contested will plainly "gifted over" the bequest of $10,000 to Butler to the other "devisees and legatees mentioned in my said will proportionately."  Moreover, our Supreme Court in *Womble* recognized that "[i]n most jurisdictions the distinction between such a conditional gift of realty and personalty with no gift over and one with gift over has been disregarded."  198 Va. at 525; *see also* Martin D. Begleiter, *Anti-Contest Clauses: When You Care Enough to Send the Final Threat*, 26 Ariz. St. L.J. 629, 649-50, 650 n.140 (1994) (noting that "[i]n the last fifty years, almost all courts have

---

[5] An English law commentator reached the same conclusion about the significance of the "gift over" provision.  *See, e.g.*, 2 Thomas Jarman, et al., *A Treatise on Wills* (2d ed. 1855) (describing no contest clauses as "regarded *in terrorem* only . . . therefore, a legatee will not, by having contested the validity or effect of the will, forfeit his legacy, where there was *probabilism causa litigandi*, unless, it seems, the legacy be given over upon breach of the condition"); *see also Wills – Construction – Condition Not to Contest Will*, 25 Harv. L. Rev. 745, 745-46 (1912) (citing *Powell* and *Morris* to explain that in England "a contest based on probable cause will not be allowed to work a forfeiture" before finding "this applies only when there is no gift over").

[6] While it has become the practice to use "no contest" and "*in terrorem*" synonymously—both describing an enforceable provision in a will disinheriting those who violate the terms of said provision—historically no contest clauses were often found to be unenforceable and then described as "*in terrorem*"—that is, they were only meant to terrify one from challenging the will.  Gerry W. Beyer, et al., *The Fine Art of Intimidating Disgruntled Beneficiaries with In Terrorem Clauses*, 51 SMU L. Rev. 225, 239 (1998).

[7] This is another reason Butler is mistaken in his reliance upon *Morris*.  Not only was the will challenge successful, the court found the no contest clause was "*in terrorem* only" because the will did not identify another person who should receive the bequest in the event the clause was violated.  *Morris*, 26 Eng. Rep. at 256; 1 Atk. at 404.

rejected the doctrine" of considering whether there was a gift over in determining the validity of a no contest clause). Even if England did once recognize this exception, we will now, following the logic in *Womble* and like many of our sister states, enforce no contest clauses regardless of the presence or absence of a gift over provision. Therefore, it follows that any limited existence of a good faith and probable cause exception to enforcement of a no contest clause in the absence of a gift over has died with the distinction upon which its existence depended.

Hence, we cannot conclude that the circuit court erred in declining to recognize an exception to the no contest clause in Helton's will and instead finding that the clause invalidated the $10,000 bequest to Butler. This strict enforcement "without any wincing on our part concerning its alleged harshness or unfairness," *Hunter*, 298 Va. at 424, is required by Virginia law absent a legislative change.

F. *The circuit court did not err when it granted Martha's demurrer as to Count II of Butler's complaint and the request for attorney fees.*

Butler finally contends that Count II of his complaint seeking recission of the 2016 and 2017 Wills based on undue influence and his request for attorney fees was authorized pursuant to Code § 8.01-221.2. We disagree.

In interpreting statutes, this Court seeks "to ascertain and give effect to legislative intent," and it "determines [that] intent from the words employed in the statute." *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) (quoting *Brown v. Commonwealth*, 284 Va. 538, 542 (2012)). When the words of the statute are "plain and unambiguous, [the Court is] bound by the plain meaning of that statutory language." *Beck v. Shelton*, 267 Va. 482, 488 (2004) (quoting *Lee County v. Town of St. Charles*, 264 Va. 344, 348 (2002)).

Code § 8.01-221.2 states:

> In any civil action to rescind a deed, contract, or other instrument, the court may award to the plaintiff reasonable attorney fees and costs associated with bringing such action where the court finds,

- 19 -

by clear and convincing evidence, that the deed, contract, or other instrument was obtained by fraud or undue influence on the part of the defendant.

Butler contends that "other instrument" includes a will, and based thereon, his complaint alleging that the will was the product of undue influence entitled him to seek recission of the will and an award of reasonable attorney fees.

However, whether a will meets the definition of "other instrument" is irrelevant here since Code § 8.01-221.2 by its own terms only applies "[i]n any civil action to rescind," and an "[e]quitable recission is a 'remedy which calls for the highest and most drastic exercise of the power of a court of chancery—to annul and set at naught the solemn contracts of parties.'" *Young-Allen v. Bank of America, N.A.*, 298 Va. 462, 468 (2020) (quoting *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 115 (2008)).  Since recission is only available as a remedy in equity and "the whole subject of the probate of wills rests upon and is regulated by statute law," *Tyson v. Scott*, 116 Va. 243, 250 (1914) (citations omitted), impeachment of a will pursuant to Code § 64.2-448 is not recission within the meaning of Code § 8.01-221.2.  Code § 8.01-221.2 does not apply to any action to impeach a will pursuant to Code § 64.2-448.  Hence the circuit court did not err in granting Martha's demurrer as to Count II of Butler's complaint.[8]

### III. CONCLUSION

Since the circuit court did not err by: (1) refusing to strike the testimony of Nelson, (2) allowing testimony concerning Butler's "live in" girlfriends, (3) refusing to recognize a good faith and probable cause exception to the enforcement of the 2017 Will's no contest clause, or (4) granting Martha's demurrer to Butler's second count, and because, assuming without

---

[8] Additionally, by its plain terms, Code § 8.01-221.2 only awards attorney fees upon a successful showing that the "instrument was obtained by fraud or undue influence."  Here, the jury did not find the 2017 Will was the product of any fraud or undue influence; therefore, even if Code § 8.01-221.2 applied to actions to impeach a will, it would not have entitled Butler to attorney fees.

deciding that the circuit court erred in striking the claim concerning the Bank of America funds, any error committed by the circuit court was harmless, we affirm the judgment of the circuit court.

*Affirmed.*