COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Chaney and Bernhard
Argued by videoconference


WILLOW OAKS APARTMENTS, L.C., ET AL.

MEMORANDUM OPINION* BY
v.      Record No. 1138-24-2            JUDGE VERNIDA R. CHANEY
                                        NOVEMBER 18, 2025

WILLIAM URBINA


FROM THE CIRCUIT COURT OF CITY OF RICHMOND
Bradley B. Cavedo, Judge

Kevin E. Martingayle (Herbert V. Kelly, Jr.; Bischoff Martingayle,
P.C.; Jones, Blechman, Woltz & Kelly, P.C., on briefs), for
appellant.

David S. Bailey (Jonathan E. Halperin; Environmental Law Group,
PLLC; Halperin Law Center, on brief), for appellee.


Willow Oaks Apartments, L.C. (Willow Oaks) and Landmark Property Services, Inc.

(Landmark) (collectively, Landlord) appeal the trial court's judgment on a jury verdict awarding

William Urbina $93,000 from Willow Oaks and $495,000[1] from Landmark. Landlord argues

that the evidence was insufficient to support Urbina's negligence claims, the Virginia Residential

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The jury verdict form reflects that the jury awarded Urbina $495,500 from Landmark. The trial judge announced the jury verdict amount of $495,500, as reflected in the trial transcript. However, the June 10, 2024 jury trial order states that the jury "found in favor of the plaintiff and award[ed] $495,000 against Landmark" and the trial court's final judgment order likewise reflects an award of $495,000. Because the record clearly shows that the trial court entered the incorrect jury award in its orders, we remand for the limited purpose of correcting this clerical error. Code § 8.01-428(B) ("Clerical mistakes in all judgments or other parts of the record and errors therein arising from oversight or from an inadvertent omission may be corrected by the court at any time on its own initiative or upon the motion of any party and after such notice, as the court may order."); *see also Sechrist v. Commonwealth*, 81 Va. App. 196, 207 (2024) ("Scrivener's or similar errors in the record, which are demonstrably contradicted by all other documents, are clerical mistakes." (quoting *Zhou v. Zhou*, 38 Va. App. 126, 133 (2002))).

Landlord Tenant Act (VRLTA) violation, and breach of contract. Landlord also contends the trial court erred in failing to order remittitur and in admitting the testimony of Urbina's treating physician.[2] Finding no error, this Court affirms the trial court's judgment.

BACKGROUND[3]

Willow Oaks Apartments, L.C., owned apartment buildings in Richmond, Virginia. From 2015 to 2019, Willow Oaks contractually delegated all managerial duties to Landmark Property Services, Inc. As relevant here, Landmark was responsible for inspecting the apartment building and repairing damage, including water saturation and mold from any water leaks. Landmark was also obligated "to get the water extracted as soon as possible to prevent any mold" resulting from the moisture.

Generally, Landmark repaired the apartment buildings' water leaks, which included addressing water saturation. At times, Landmark called contractors to perform additional, specialized work, including drywalling after water leak repairs. For instance, if water leaked through the drywall, Landmark ensured the affected area was completely dry and then called a contractor to replace the drywall. Additionally, Landmark hired its contractor, Diamond Enterprise, Inc., to extract water from carpets. However, Diamond is not qualified to treat mold. If Landmark had the slightest concern about mold, it would have called a contractor specialized in mold remediation. Landmark relied on its maintenance staff to assess the mold and organize remediation, despite the staff's inadequate training in mold assessment. Landmark testified that,

---

[2] In his appellate brief, Urbina also requested that this court dismiss Landlord's claims because Urbina claims Landlord failed to address Code § 8.01-226.12(F). Urbina withdrew his request for dismissal at oral argument.

[3] Under settled principles, we recite the relevant facts in the light most favorable to Urbina, who prevailed below. *Agnew v. United Leasing Corp.*, 80 Va. App. 612, 619 (2024).

"as a practice," it did not "close out a service request without having confirmed that work had been done and [if] there was a need for a specialty contractor."

In December 2014, Urbina moved into an apartment at Willow Oaks with his two children. Urbina was an active and healthy individual who enjoyed hiking, cycling, and working out. He did not regularly take any medication and only experienced seasonal allergies. Although he had athletically induced asthma, he had not experienced symptoms in 34 years. Soon after moving into Willow Oaks, Urbina's apartment began having water intrusion problems.

In 2015, Urbina made five water-related service requests. In July 2015, a leak came from the hallway ceiling. After Landmark repaired the leak, a week later, a rust-colored stain appeared in the same spot. Concerned that water was still leaking, Urbina informed Landmark. In response, Landmark repainted the ceiling. Urbina reported additional leaks appearing outside his unit, between his unit and the next, and in his hallway between the kitchen and from the HVAC closet. He stated that, in response to these complaints, Landmark typically ran fans in the affected areas and told Urbina to put towels down. On July 29, Landmark arranged for Diamond to service the area. Diamond extracted water from the carpet and pad, and sprayed Microban to stop mold growth. Soon after, Urbina noticed the common area entrance to his unit appeared wet and smelled like mildew. Four days later, Landmark once again called Diamond, who sprayed more Microban.

In 2016, Urbina made three more water-related service requests. Leaks from the upstairs apartment and from his HVAC closet saturated the hallway carpet leading into Urbina's kitchen; Landmark completed repair work almost a week later. Two months after that, Landmark repaired another leak from the HVAC closet that had accumulated so much water on the carpet

that it was "squishy over [his] toes and wet" when he walked on it. Landmark serviced the leak and Diamond extracted water from the kitchen and the hallway.

In 2017, a large, water-filled bubble formed in the ceiling of Urbina's hall bathroom. Landmark pierced the bubble with a screwdriver and placed a bucket underneath. Three weeks later, Landmark had a contractor replace the drywall.

In January 2018, Urbina reported "dripping down significantly from the ceiling" that resulted in "a rust-colored stain." Two days later, his primary bathroom experienced a "very bad" leak from the apartment above. Three weeks later, Landmark spent two minutes repairing the leaks. In April 2018, Urbina noticed a bad smell emanating from the area where Landmark had punctured the water bubble with a screwdriver the previous year. Concerned that there may be another leak, he submitted a service request and asked Landmark to check for moisture. Ten days passed before Landmark closed the work order and indicated "Actions performed: none." Later that month, Urbina again experienced a leak that made his carpet so wet that when he walked on the carpet it "squishe[d]" and water came up "just over [his] toes." Three days later, Landmark performed a brief repair lasting one minute. In July 2018, Urbina's HVAC closet leaked again, and Landmark conducted another one-minute repair. The next day, Diamond extracted water from the carpet, treated the area with Microban, and "removed molded and mildewed tiles." Diamond included information about mold in an invoice to Landmark, but Urbina was not informed about the mold.

In March 2019, Urbina began to feel ill. He experienced symptoms he had never felt before, including tingling sensations in his fingers that spread down his arm, numbness in his legs, severe muscle spasms that lasted multiple days, "major fatigue," labored breathing, memory deficits, and a 20-pound weight loss. He sought medical attention and made more than five trips

to the emergency room. Yet, testing, including CT scans, EKG, and MRI, failed to explain his symptoms. As his symptoms worsened, Urbina felt scared and frustrated.

In April 2019, Urbina sought care from Dr. Cathryn Harbor, a family practitioner trained in functional medicine. After reviewing his symptoms, Dr. Harbor diagnosed Urbina with "mold illness." Dr. Harbor treated Urbina with medication that removed toxins and mold particles from his body and recommended that he either install a better filtration system or leave his apartment. Although the medication improved his symptoms, Urbina still experienced neural inflammation, and Dr. Harbor recommended testing for mold in his apartment.

In June 2019, Urbina hired ECS Mid-Atlantic, LLC, to conduct a mold test within his apartment and report their findings. In his HVAC closet, ECS found visible mold, as well as long-term water damage that promotes the growth of mold. The test revealed seven species of mold, including Stachybotrys, also known as black mold, as well as evidence of mold growth. Urbina's water-stained primary bathroom ceiling also tested positive for mold, including highly toxic black mold in the air. ECS found water-stained flooring and drywall in the hallway adjacent to the HVAC closet and the hallway bathroom ceiling, which also had elevated moisture content, creating a risk for mold growth. ECS reported that the humidity levels in the living room and primary bathroom were above the industry standard and presented a risk for mold growth. ECS recommended "further investigat[ion] [of] the evidence of water intrusion and mold that had been identified."

Based on the ECS mold test results, particularly "the high humidity and presence of Stachybotrys," Dr. Harbor concluded that Urbina's apartment was "not compatible with health." She prepared a letter for Urbina requesting early termination of his lease because the mold in the apartment made him sick. Urbina gave Landmark Dr. Harbor's letter along with a move-out notice.

- 5 -

Skeptical of the letter, Landmark performed its own investigation. Despite its lack of qualifications in humidity and mold testing, Landmark concluded that Urbina's apartment was dry and mold-free. Diamond, also unqualified, agreed with Landmark that the apartment did not have mold. Accordingly, Landmark did not honor Urbina's request to end the lease early.

Soon after, on August 2, 2019, Urbina heard cracking and a "boom" from his living room. The ceiling had collapsed due to an upstairs leak, and drywall and insulation covered his living room. "Black stuff" covered the ceiling beam and coated the insulation. Urbina told Landmark and requested a hotel. Landmark viewed the scene and denied Urbina's request for a hotel, concluding that the living room did not contain signs of water damage or mold. Landmark instructed Urbina to "put plastic over" the living room ceiling that was on his floor.

ECS returned the same day, and performed testing that confirmed the presence of mold in the air, as well as on the insulation and drywall. The living room contained elevated airborne mold spores and active mold growth, including black mold, as well as building materials with water staining. Additionally, the "black stuff" on the ceiling was visible mold with active growth. The insulation and drywall also contained mold, including black mold; the insulation had indicators of an ongoing source of moisture, as well. In addition, the high mold quantity strongly indicated active growth. The results also signified that the living room ceiling cavities had excessive mold growth and a long-term water source. ECS recommended mold remediation in accordance with Virginia law and professional standards.

Based on health concerns, an ill Urbina moved out with his children. He left his personal belongings because they were beyond repair. Urbina's symptoms persisted after he left the apartment, but eventually improved. The numbness in his limbs and muscle spasms became less frequent. But he continued to experience sensitivity to light, joint pain, and rattling in his head.

He also continued to suffer cognitive deficits, including trouble recalling his children's names, as well as ongoing breathing issues—none of which he experienced before the mold exposure.

In January 2021, Urbina consulted Dr. Arvind Madaan, an allergist/immunologist. Dr. Madaan found Urbina to be severely allergic and recommended inhalers and allergy immunity shots. However, the immunity shots were too expensive for Urbina due to his medical bills and medications from Dr. Harbor. Dr. Madaan also performed a breathing test, from which Dr. Madaan determined that Urbina, at 44 years old, was breathing like a 62-year-old. Dr. Madaan concluded that Urbina had "an inflamed immune system" that was "not doing a very good job of handling environmental triggers." Two years later, in February 2023, Dr. Madaan repeated the breathing test. Dr. Madaan testified that the 2023 testing showed that Urbina, then 46 years old, was breathing like a 78-year-old. Dr. Madaan also noted that this was "one of the roughest allergy seasons on record."

Urbina sued Willow Oaks and Landmark. He alleged a violation of the VRLTA and breach of contract against Willow Oaks. Urbina's suit also asserted a common law negligence claim against Landmark, as well as a negligence claim for violating the mold remediation statute against both defendants.[4]

At trial, Landmark's regional manager claimed that they addressed Urbina's water problems "so there would not be any mold." They extracted water, put in dryers, and removed sheetrock as needed. When making these repairs, Landmark assessed for potential mold, but saw no signs of it.

---

[4] Urbina's complaint also claimed negligence per se for violating the building code and Virginia's mold remediation statute, as well as violation of the Virginia Consumer Protection Act. Those claims were either dismissed by the trial court or withdrawn by Urbina. Urbina also proceeded with the VRLTA claim against Willow Oaks only.

Robert Curran, an environmental project manager from ECS, testified as an expert in mold sampling and investigation. He explained that the presence of mold generally indicates water intrusion or elevated relative humidity. As Curran testified, according to industry standards, many molds grow after 24 to 48 hours of continued moisture impact. He specified that black mold requires "about 30 days of elevated moisture impact or water intrusion to a surface area" as it feeds on the "younger" molds. Therefore, he stated, when materials are only occasionally wet or are completely dry, black mold will not develop. He also explained that mold can grow when the humidity level exceeds the industry standard for acceptable levels of interior relative humidity. Curran cautioned that humidity in a wall cavity poses a particular risk for mold growth because the area is inaccessible and concealed.

Christopher Chapman, a certified industrial hygienist at ECS, testified as an expert on industrial hygiene, mold, and water damage remediation. According to the standard of care for water remediation, Chapman testified that the first step is "to identify and correct the water leak." The next step, he said, is to remove or dry impacted materials as soon as possible because mold "will begin to develop within . . . 24 to 48 hours, typically 48 hours." Chapman explained that black mold indicates "a sustained moisture source." Chapman also explained that mold hidden in a wall or ceiling cavity may spread into an apartment through airflow. He added that all molds and byproducts from actively growing mold may harm a person's health.

Dr. Harbor testified as Urbina's treating physician and an expert in the health effects of mold. She stated that mold is a biological toxin that activates the innate immune system and can cause neurologic and immunologic harm. Dr. Harbor opined that mycotoxins diffuse through the whole body and can cause illnesses, such as dementia. Mold creates "biologically active toxins" as it grows, so wet and humid conditions that enable mold to thrive are of grave concern. She

also explained that mold in an environment with elevated humidity will regenerate faster than it can be cleaned.

Dr. Harbor ruled out other causes of Urbina's symptoms, such as Lyme disease and Bartonella. In addition, having considered that Urbina lived in a damp environment and had neurological symptoms consistent with mold exposure, she concluded to "a degree of more probable than not that the cause of Mr. Urbina's illnesses" was "mold exposure." Dr. Harbor's prescriptions afforded Urbina some relief, but he continued to suffer from neural inflammation, resulting in tremors, fatigue, an inability to concentrate, and memory loss. She could not provide a specific recovery time, explaining that people recover at different rates and some people take a "long time to rewire their innate immune system."

Dr. Madaan also testified as Urbina's treating physician and an expert in mold health effects. Urbina's immune system remained inflamed. Dr. Madaan testified that when he first treated Urbina in January 2021, Urbina "was a 44-year-old person who . . . was breathing like a 62-year-old." Dr. Madaan opined that Urbina's mold exposure and inflamed immune system "aggrevate[d]" his allergies.

After both treating physicians testified and were excused, Landlord moved to strike their testimony; the trial court said it would address the motion at the end of Urbina's case. At the conclusion of Urbina's evidence, Landlord again moved to strike the evidence. The trial court granted Landmark's motion and struck Urbina's claim for loss of personal property under the VRLTA and lease. However, the trial court denied the motion to strike the remaining claims, including for loss of use of property.[5] The trial court also denied Landlord's motion to strike the treating physicians' expert testimony.

---

[5] The trial court's order states that it granted the motion to strike the VRLTA and contract claims, but provided awards under those claims. Given this ambiguity, we look to the transcript for clarity. *See, e.g.*, *Cohan v. Thurston*, 223 Va. 523, 525 (1982) (finding extrinsic evidence can

During their case, Landmark's regional manager testified that Landmark does not monitor how Diamond extracts water. She claimed that she never saw the Diamond invoice that said "mold." Despite Urbina's request for an early lease termination due to mold, the regional manager stated that Urbina had told Landmark he had not seen any mold in the apartment and had never complained about it. Finally, she claimed Landmark never knew about the ECS mold testing and report in June 2019.

At the close of all evidence, the jury found that Willow Oaks had violated the VRLTA and breached the lease. It awarded Urbina $46,500 for each of the claims. Additionally, the jury found Landmark liable for common law negligence and awarded Urbina $495,500 in damages. The jury found for the Landlord on Urbina's claims of additional statutory violations. The jury also awarded Urbina interest on $530,000 of the award.

After a hearing, the trial court denied Landlord's post-trial motions to set aside the verdict and remittitur; it then entered judgment on the jury's verdict.

## ANALYSIS

Urbina's rented apartment experienced water intrusions starting in 2015, which led to the growth of mold. Mold in the apartment was confirmed in 2018, and black mold was detected in June 2019. Urbina lived with mold or black mold or both in the apartment from 2018, became seriously ill from mold-related maladies in March 2019, and left the apartment with his children only after the ceiling collapsed in August 2019, exposing even more black mold and ruining many of his belongings. His health problems have persisted. Although Urbina seemed to improve after leaving his apartment, Urbina was 44 years old but breathing like a 62-year-old in

explain an ambiguity in a document). After finding inadequate evidence of personal property value, the trial court granted the motion to strike only as to those values; to the extent there were other damages, such as loss of use, those counts survived.

- 10 -

2021, and at 46 years old, he was breathing like a 78-year-old in 2023. These conditions support the jury's verdict based on negligence, breach of contract, and VRLTA violations.

## I. Negligence

The Landlord contends that Urbina's evidence was insufficient to establish negligence. The Landlord claims that it owed no duty to Urbina and that Urbina failed to demonstrate any of the necessary elements of negligence. We disagree.

"It is well-settled that 'a party who comes before us with a jury verdict approved by the [trial] court "occupies the most favored position known to the law."'" *N. Va. Kitchen, Bath & Basement, Inc. v. Ellis*, 299 Va. 615, 622 (2021) (quoting *Ravenwood Towers, Inc. v. Woodyard*, 244 Va. 51, 57 (1992)). We will not set aside a trial court's judgment sustaining a jury verdict unless it is "plainly wrong or without evidence to support it." *Id.* (quoting *Parson v. Miller*, 296 Va. 509, 524 (2018)). When the trial court has declined to set aside a jury verdict, we consider only whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury's verdict. *Boyd v. Weisberg*, 75 Va. App. 725, 736 (2022).

The elements of negligence are a legal duty owed to the plaintiff by the defendant, breach of that duty, and a showing that such breach proximately caused an injury, resulting in damage to the plaintiff. *Blue Ridge Serv. Corp. v. Saxon Shoes, Inc.*, 271 Va. 206, 218 (2006) (citing *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780 (1951)).

### A. Assumption of Duty

"[T]he question of liability for negligence cannot arise at all until it is established that the man who has been negligent owed some duty to the person who seeks to make him liable for his negligence." *Tingler v. Graystone Homes, Inc.,* 298 Va. 63, 79 (2019) (alteration in original) (quoting *Dudley v. Offender Aid & Restoration of Richmond, Inc.*, 241 Va. 270, 277 (1991)). That "duty must arise by operation of law and not by mere agreement of the parties." *Id.* at 80

(quoting *Glisson v. Loxley*, 235 Va. 62, 67 (1988)). Accordingly, we must ascertain "the source of the duty violated." *Id.* at 81 (quoting *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (2017)).

Landmark argues that it owed Urbina no duty to make repairs. Indeed, a landlord does not have a common law duty to "maintain in a safe condition any part of the leased premises which are under a tenant's exclusive control." *Isbell v. Commercial Inv. Assocs., Inc.*, 273 Va. 605, 611 (2007) (quoting *Paytan v. Rowland*, 208 Va. 24, 26 (1967)). Still, in Virginia, it is well established "that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Kellermann v. McDonough*, 278 Va. 478, 489 (2009) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28 (1980)).

This assumption of duty arises when a defendant agrees "to render services to another which he should recognize as necessary for the protection of the other's person or things" and fails "to exercise reasonable care" in doing so. *Id.* (quoting *Didato v. Strehler*, 262 Va. 617, 629 (2001)). An assumption of duty may be established through "clear expression of intent," *A.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 624 (2019), or "impliedly assumed from the defendant's conduct," *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 138 (2018). Pertinent here, "where the landlord enters leased premises for the purpose of making repairs, he must use reasonable care in performing the work." *Sales v. Kecoughtan Hous. Co.*, 279 Va. 475, 480 (2010) (citing *Holland v. Shively*, 243 Va. 308, 311 (1992)); *see also Oden v. Housing Auth.*, 203 Va. 638, 640 (1962) ("It has long been the law in Virginia that where a landlord enters leased premises, after delivering possession to the tenant, for the purpose of making repairs, he must use reasonable care in performing the work."). If the landlord "makes repairs to the leasehold premises and, in the process of doing so, creates a dangerous condition by 'a *positive* act of negligence on its part,' the landlord can be held liable in tort." *Tingler,* 298 Va. at 95 (quoting *Luedtke v. Phillips*,

- 12 -

190 Va. 207, 212 (1949)). VRLTA did not abrogate common law tort duties and provides, in part, that "'[t]he landlord or managing agent with maintenance responsibilities shall comply with any other applicable provisions of law'—which would include common law obligations." *Cherry v. Lawson Realty Corp.*, 295 Va. 369, 377 (2018) (alteration in original) (quoting Code § 8.01-226.12(F)).

Landmark concedes that it performed repairs in Urbina's apartment to address moisture levels and water leaks. At trial, Landmark admitted that the repair work included preventing and assessing for mold. The evidence showed that Landmark entered Urbina's unit repeatedly over an extended period to make repairs for water leaks and intrusion, including searching for the leak source, addressing saturation, and assessing the potential for mold. In *Sales*, the Supreme Court of Virginia held that an agent who made "repairs in a careless, reckless, and negligent manner" that resulted in mold growth could be subject to a negligence action brought against them. *Sales*, 279 Va. at 479-80. Thus, Landmark assumed a duty to Urbina to make the repairs with reasonable care.

### B. Standard of Care

Landlord also asserts that Urbina failed to present sufficient evidence to establish "the appropriate professional standard of care in making the repair." "Generally, expert testimony is required to establish the standard of care in 'highly technical professions . . . unless the matters pertaining to the duty and the breach are obvious "from ordinary human knowledge and experience."'" *Lyle, Siegel, Croshaw & Beale, P.C. v. Tidewater Cap. Corp.*, 249 Va. 426, 433 (1995) (alteration in original) (quoting *Nelson v. Commonwealth*, 235 Va. 228, 236 (1988)).

Chapman, a certified industrial hygienist, testified that the standard of care for moisture prevention and mold remediation involves identifying and correcting water leaks, then following the path of moisture and removing or drying impacted materials as soon as possible. Chapman's

testimony provided sufficient evidence on the standard of care. The codes and documents Chapman relied on to formulate his opinion are "the type of materials that are identified as determining the requisite standard of care under Virginia law." *Finney v. Clark Realty Cap.*, *LLC*, 2022 U.S. Dist. LEXIS 18645, *10-11 (E.D. Va. Jan. 31, 2022). "The Virginia Code establishes that standards of mold remediation should be based on professional standards and regulatory documents such as those promulgated by the EPA. *See* Code § 8.01-226.12." *Id.* at *11. Here, Chapman relied on professional standards and regulatory documents from the EPA and IICRC[6] guidelines.

In addition, two experts—Chapman and Curran—concurred that mold grows quickly in humid and wet conditions. Thus, delays in water intrusion repair create a risk of mold growth. Chapman and Curran stated that a wet area should be corrected within 24 to 48 hours to prevent mold development. Landlord acknowledged this standard, conceding that "water must be extracted as soon as possible to prevent mold" because "mold requires moisture to grow." Curran also testified that the presence of mold indicates the presences of moisture, so remediation or corrective action is necessary to prevent further water intrusion. Thus, Urbina presented sufficient expert testimony on the necessary standard of care to prevent mold. Whether Landlord satisfied that standard was properly a question for the jury. *See Sales*, 279 Va. at 479-80.

### C. Breach of the Standard of Care

A tenant must present sufficient evidence to establish that the "repairs were made in a negligent manner," causing the tenant harm. *Holland*, 243 Va. at 311 (quoting *Oden*, 203 Va. at 640). The record supports the jury's factual finding that Landmark failed to use reasonable care in identifying and correcting water leaks.

---

[6] Institute of Inspection Cleaning, Restoration, and Certification.

Urbina's apartment endured years of recurring, severe leaks from the HVAC closet and the upstairs apartment. The ongoing leaks caused musty smells, rust colored stains, long-term water damage, elevated humidity, and mold. In several instances, Landmark "repaired" those water leaks with minimal effort, as reflected in their work orders, and waited more than 48 hours after Urbina's reports to dry or remove water-affected materials. Landmark's repairs were ineffective; they did not address the water intrusions or the mold, as evidenced by the ongoing leaks and odors. Indeed, the presence of mold—particularly black mold—indicated long-term water damage in Urbina's apartment. Further, in July 2015 and July 2018, Landmark's contractor, Diamond, "treated with Microban" after extracting water "to stop mold from forming," even though Diamond was not qualified to treat for mold. In 2018, when Diamond reported mold in the apartment, Landmark failed to take corrective action by identifying and repairing the source of the water intrusion. Finally, the collapse of Urbina's living room ceiling demonstrates Landmark's repair was substandard. The ceiling materials contained evidence of an ongoing source of moisture and high concentrations of various molds. Photos showed multiple strips of insulation thickly coated in "black stuff."

Landmark argues that Urbina did not identify "a specific repair that was negligently performed." But "the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005). "Inferences drawn from physical facts may be as strong as direct evidence. Such inferences amount to circumstantial evidence. Facts may be proven by circumstantial evidence as well as by direct evidence." *Barry v. Tyler*, 171 Va. 381, 388 (1938). Accordingly, a jury reasonably could infer from the facts that Landmark made negligent repairs that created a consistently wet environment and allowed significant amounts of mold to grow. *See Tingler*, 298 Va. at 95.

D. Proximate Cause

"The proximate cause of an event is that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Blue Ridge Serv. Corp.*, 271 Va. at 218 (quoting *Beale v. Jones*, 210 Va. 519, 522 (1970)). It may be proven by circumstantial evidence, if that evidence shows that causation is "a probability rather than a mere possibility." *Al-Saray v. Furr*, ___ Va. ___, ___ (Jan. 16, 2025) (quoting *Bussey v. E.S.C. Rests. Inc.*, 270 Va. 531, 536 (2005)). "[P]roximate cause is a question for the jury. It becomes one of law only when the minds of reasonable men could not differ." *Duncan v. Hixon*, 223 Va. 373, 376 (1982).

When "a jury verdict is based on circumstantial evidence, '[i]t is not necessary that the circumstances establish negligence as the proximate cause with such certainty as to exclude every other possible conclusion.'" *Al-Saray*, ___ Va. at ___ (alteration in original) (quoting *Bly v. Southern Ry. Co.*, 183 Va. 162, 176 (1944)). What is required is that the "jury be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible." *Id.* at ___ (quoting *Bly*, 183 Va. at 176). Therefore, the question for this Court is "whether the inference that served as the basis for the jury's verdict was reasonable in light of the evidence." *Id.* at ___.

Landmark contends Urbina "failed to prove proximate causation" because he did not prove the apartment contained mold before June 2019 or what kind of mold caused his injuries. Landmark's argument erroneously overlooks the value of circumstantial evidence. *See Barry*, 171 Va. at 388 ("Inferences drawn from physical facts may be as strong as direct evidence."). "Such a limited view of the facts" also does not view the evidence "in the light most favorable" to Urbina. *Al-Saray*, ___ Va. at ___. The evidence Urbina presented permitted the jury to conclude with probable certainty that mold in Urbina's apartment caused his sickness.

- 16 -

Urbina provided evidence that mold can harm an individual's health because it creates "biologically active toxins." Chapman testified that anything "coming off of that growing mold, whether it's mycotoxins or [volatile organic compounds] or the spores, all of those materials have the potential to cause health concerns." Dr. Harbor explained that mold is a biological toxin that activates the innate immune system and can cause neurological and immunological harm. The mycotoxins spread throughout the body and tend to target different areas. For instance, some reach the brain and contribute to dementia. Furthermore, Urbina's symptoms were consistent with mold exposure. Urbina presented to Dr. Harbor with neurological symptoms. He had already visited multiple hospitals and undergone numerous tests and exams without receiving a diagnosis. After ruling out other causes for his symptoms, Dr. Harbor diagnosed Urbina with mold illness. Dr. Madaan testified that mold exposure worsened Urbina's immune system.

Considering the timeline of water leaks, a jury reasonably could infer that mold existed in the apartment in March 2019, when Urbina began experiencing significant health issues. Indeed, Diamond reported mold in the apartment in July 2018. By the time Urbina became ill, he had endured years of dampness in the apartment and, more recently, incomplete mold remediation by an unqualified company. Thus, unsurprisingly, more mold growth was found in Urbina's unremedied apartment in June 2019, and the presence of black mold meant it had been there *at least* 30 days before its discovery. The collapse of Urbina's living room ceiling revealed the full scope of the neglect and persistent presence of mold in the apartment. Therefore, the "combined force" of "concurrent and related circumstances" in this case leads to the "irresistible conclusion" that mold also grew in the apartment in March 2019. And the medical evidence establishes that mold caused Urbina's illness. *See Al-Saray*, ___ Va. at ___.

Landlord concedes that proximate cause is a question of fact for the jury but argues that the evidence is insufficient, citing *Cooper v. Whiting Oil Co.*, 226 Va. 491 (1984). Landmark's reliance on *Cooper* is misplaced. *Cooper* involved a leaking gas tank that the defendant negligently refilled, causing the tank to leak again. *Id.* at 496. But because the plaintiff did not provide evidence of the amount of gas that had leaked *before* the negligent refilling, the jury had no basis to conclude that the *refilled* gas proximately caused the plaintiff's damages. *Id.* In contrast, the evidence before the jury here permitted the conclusion that Urbina was in good health when he moved into the apartment, but after years of persistent water intrusion, the apartment became a breeding ground for the mold that caused Urbina's illness.

## II. Remittitur

We review a circuit "court's decision to accept or reject a jury's award of damages" for abuse of discretion. *City-To-City Auto Sales, LLC v. Harris*, 78 Va. App. 334, 348 (2023) (citing *Allied Concrete Co. v. Lester*, 285 Va. 295, 311 (2013)). "The abuse of discretion standard is 'highly deferential' to trial courts and is rooted in the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Huguely v. Commonwealth*, 63 Va. App. 92, 107 (2014). An abuse of discretion occurs "only when reasonable jurists could not differ." *Id.* at 107-08.

A circuit court accepts the jury's award when the evidence viewed in the light most favorable to the prevailing party below sustains the jury verdict. *City-To-City Auto Sales, LLC*, at 348-49. "An impartial jury properly instructed is the best tribunal to pass upon the amount of damages to be awarded in cases involving personal injury." *Miller v. Vaughan Motor Co.*, 207 Va. 900, 904 (1967) (quoting *Nat'l Fruit Prod. Co. v. Wagner*, 185 Va. 38, 40 (1946)). Thus, the jury verdict on damages is entitled to the "utmost deference." *City-To-City Auto Sales, LLC*, 78 Va. App. at 349.

Remittitur is justified only when the award "appears to be the result of passion, prejudice or corruption, or misconception of facts or law, or where the disproportion between the plaintiff's injuries and the award is so great as to suggest that the decision was not fair and impartial." *Miller*, 207 Va. at 904 (quoting *Wagnstrom v. Pope*, 207 Va. 761, 763 (1967)). The award of damages must be "so great" that it "shock[s] the conscience of the court." *City-To-City Auto Sales, LLC*, 78 Va. App. at 348 (alteration in original) (quoting *Allied Concrete Co.*, 285 Va. at 311). "The law wisely leaves the assessment of damages, as a rule, to juries, with the concession that there are no scales in which to weigh human suffering, and no measure by which pecuniary compensation for personal injuries can be accurately ascertained." *C. D. Kenny Co. v. Solomon*, 158 Va. 25, 31 (1932) (quoting *Chesapeake & O. Ry. Co. v. Arrington*, 126 Va. 194, 217 (1919)).

"[C]ompensatory damages are those allowed as a recompense for loss or injury actually received and include loss occurring to property, necessary expenses, insult, pain, mental suffering, injury to the reputation and the like." *N. Va. Kitchen*, 299 Va. at 625 (quoting *Giant of Va., Inc. v. Pigg*, 207 Va. 679, 685 (1967)). Monetary damages, including medical expenses, are not a necessary predicate for an award of compensatory damages. *Id.* at 624, 627.

Nothing in the record suggests that the jury's verdict resulted from any passion, prejudice or corruption, or any misconception of the facts or the law. Yet Landlord contends that the jury verdict ($495,500 against Landmark and $93,000 against Willow Oaks) is shocking, excessive, and unsupported by the evidence. As Landmark sees it, Urbina did not present evidence of expenses related to his treating physicians or that he was prevented from performing primary life functions. We disagree.

The evidence, along with its reasonable inference, showed that a healthy, active Urbina moved into the Willow Oaks apartment. The surprising onset of serious, unexplainable

symptoms caused him fear and frustration, and he lost 20 pounds. Seeking a diagnosis, Urbina incurred medical expenses visiting more than five emergency rooms and undergoing CT scans, MRIs, and EKGs. Under Dr. Harbor's care, Urbina underwent additional tests and received an extensive care plan that included prescriptions he is still taking today. Because of his expensive medical bills and other costly medications, he cannot afford the immunity shots Dr. Madaan recommended.

At trial, Urbina shared how difficult it was to move out of his apartment and rebuild his home while being so sick. And some of his symptoms remain; he continues to suffer from muscle numbness and spasms, cognitive and memory issues, and fatigue. Urbina can no longer participate in activities he used to enjoy such as long hikes and basketball with his children, because of fatigue so severe that he gets winded even when checking the mail. Dr. Madaan testified that when he first treated Urbina in January 2021, Urbina "was a 44-year-old person who . . . was breathing like a 62-year-old." Dr. Harbor opined that the damage from mold exposure will never fully resolve.

Given this evidence, the award is not so excessive as to "shock the conscience." *City-To-City Auto Sales, LLC*, 78 Va. App. at 349. Nor is there any indication in the record that "passion, prejudice, or corruption" motivated the jury's decision. *See Miller*, 207 Va. at 904. Thus, the trial court did not abuse its discretion denying remittitur.

III.  Breach of Contract and VRLTA

A tenant may be awarded damages for a landlord's violation of the VRLTA,[7] and the lease.[8]  These damages include the landlord's failure to perform mold remediation on personal property.  Code § 55.1-1220(A)(5) (referencing Code § 8.01-226.12, which includes remediation of personal property).  VRLTA did not abrogate common law tort duties.  *Cherry*, 295 Va. at 377.  Damages available under the VRLTA are consequential damages such as those flowing from a breach of contract.  *Isbell*, 273 Va. at 616.  Urbina was entitled to recover economic damages under the VRLTA.  *See* Code § 55.1-1234 ("[T]he tenant may recover damages and obtain injunctive relief for noncompliance by the landlord with the provisions of the rental agreement or of this chapter."); Code § 55.1-1231 ("The landlord shall pay all costs of the relocation and the mold remediation[.]"); Code § 55.1-1220(A)(5) (referring to Code § 8.01-226.12, containing definition of mold to include remediation of personal property).[9]  Also, damages for breach of the covenant to repair include "the costs of repairs and any loss of use suffered by the tenant after the lapse of a reasonable time from giving the notice in which to make repairs."  *Caudill v. Gibson Fuel Co.*, 185 Va. 233, 240-41 (1946).

---

[7] *See* Code § 55.1-1234 (stating that a "tenant may recover damages and obtain injunctive relief for noncompliance by the landlord with the provisions of the rental agreement or of this chapter"); *see also Steward v. Holland Fam. Props., LLC*, 284 Va. 282, 289 (2012) (stating that the VRLTA imposes contractual duties on the landlord).

[8] *See, e.g.*, *Richmond Med. Supply Co. v. Clifton*, 235 Va. 584, 586 (1988) (permitting tenant to maintain suit for breach of contract under the lease).

[9] At oral argument, Landlord also argued that Code § 8.01-226.12 does not apply because there was no "visible" mold.  As the Virginia Supreme Court explained in *Cherry*, "Code § 8.01-226.12(E) contemplates that the landlord and/or the managing agent can be held liable for failing to satisfy its statutory obligation to perform proper mold remediation when visible mold has occurred."  *Cherry*, 295 Va. at 377.  Evidence presented at trial demonstrated the presence of visible mold in the apartment including the 2018 invoice from Diamond Enterprises that noted "molded [and] mildewed tiles," as well as the ECS reports.

Willow Oaks argues that because the trial court struck the replacement costs of Urbina's abandoned personal property, the verdicts for violating the VRLTA and breach of the lease were based on speculation or conjecture. Willow Oaks also concludes that the jury must have disregarded instructions not to consider personal injury damages for these claims.[10]

But Urbina provided other evidence of loss under the VRLTA, including the loss of use of his apartment. Urbina suffered loss of use of his personal property and the residence when thousands of pounds of drywall ceiling, coated in toxic black mold, collapsed into his living room. Expert testimony established that these conditions rendered the apartment unsafe for habitation.

Urbina notified Willow Oaks of the collapse of his ceiling and requested a hotel, but Willow Oaks denied that request and instead instructed him to cover the damage with plastic. Feeling unsafe to remain in his apartment, Urbina moved out. The ceiling collapse and the high mold count damaged his property beyond repair. Dr. Harbor testified that it is "important not to take with you porous materials . . . that might have mold toxins on them." The jury heard evidence of the personal property Urbina left behind and that he is still without some of this property.

Having notified Willow Oaks of the catastrophic collapse of the ceiling that damaged his personal property beyond repair, Urbina was entitled to damages for the loss of use of the property. *See Caudill*, 185 Va. at 240-41. The evidence supported awards for Willow Oaks's violation of the VRLTA and the breach of Urbina's lease. In addition, the circuit court properly instructed the jury not to consider personal injury damages, and the record does not suggest that

---

[10] During oral argument, Landlord further asserted that Urbina was trying to "take some regulatory provisions that have very limited remedies and turn them into a negligence tort claims." As explained above, and acknowledged in the Landlord's brief, the damages available under the VRLTA are consequential damages such as those flowing from breach of contract. *Isbell*, 273 Va. at 616.

the jury failed to follow the court's instructions. *See, e.g.*, *Prieto v. Commonwealth*, 283 Va. 149, 169 (2012) (appellate courts presume jurors followed the trial court's instructions). Therefore, we affirm the circuit court's judgment declining to set aside the jury's award of damages.

IV.  Expert Testimony

Landlord argues the trial court should have struck the testimony of both Dr. Harbor and Dr. Madaan because their opinions were based on speculation and facts not in evidence. Landlord objects to Dr. Harbor's assumption that mold existed in Urbina's apartment before April 2019 and to Dr. Madaan's understanding from Urbina that Urbina lived in a moldy apartment for four years.

"Expert testimony is admissible in civil cases to assist the trier of fact, if the testimony meets certain fundamental requirements, including the requirement that it be based on an adequate factual foundation." *Countryside Corp. v. Taylor*, 263 Va. 549, 553 (2002) (citing Code §§ 8.01-401.1, -401.3). But "[a]n objection to the admissibility of evidence must be made when the evidence is presented." *Butler v. Stegmaier*, 77 Va. App. 115, 125 (2023) (quoting *Bitar v. Rahman*, 272 Va. 130, 139 (2006)). A defect in an expert witness's testimony may not be apparent initially, but the objection must be raised "at that first opportunity" to be timely. *Id.* at 126 (quoting *Bitar*, 272 Va. at 140). An objection "to flawed expert testimony" is timely if made as soon as the flaws "become apparent." *Id.* at 127 (quoting *Vasquez v. Mabini*, 269 Va. 155, 163 (2005)). An "objection comes too late if the objecting party remains silent during its presentation and brings the matter to the court's attention by a motion to strike made after the opposing party has rested." *Id.* at 125 (quoting *Bitar*, 272 Va. at 139).

In *Bitar*, the Supreme Court determined that where a defect was "obvious by the end of the direct examination . . . an objection could have, and should have, been made at that time."

*Bitar*, 272 Va. at 140.  Similarly, in *Butler*, this Court held that the defendant's motion to strike the expert testimony was untimely because the grounds for objecting were apparent "long before" the expert's testimony concluded.  *Butler*, 77 Va. App. at 127.  The defendant had also consented to releasing the witness.  *Id.*  "Since any foundational objections to the admissibility of [the expert's] testimony were evident by the conclusion of her redirect examination," we found that the motion to strike her testimony as inadmissible "was simply untimely."  *Id.* at 126-27.

But Landlord did not object to either doctor's testimony until the doctors had been excused.  The court excused Dr. Harbor and later Dr. Madaan.  After both had been excused, Landlord stated that he had "a motion to strike the doctors, both doctors."  Yet the alleged flaws in the challenged testimony became clear early in the cross-examination of Dr. Harbor and direct-examination of Dr. Madaan.  However, Landlord did not object to the foundation of the expert opinions "at that first opportunity."  Instead, Landlord continued to cross-examine Dr. Harbor and then "remained silent" as Urbina redirected Dr. Harbor and the court excused her.  Urbina then called his next witness, Dr. Madaan.  Similarly, by the time Urbina finished his examination of Dr. Madaan, the alleged flaw in his testimony had become clear to Landlord, who concentrated on the testimony during a brief cross-examination.  Still Landlord sat silently as Urbina declined to redirect, and the court excused the doctor.  Urbina even addressed a matter regarding one of Dr. Madaan's exhibits before Landlord moved to strike the testimony of both doctors.  By waiting until well after the claimed "flaws had become apparent" in the experts' testimony, Landlord waived their objection to the admissibility of that testimony.  *See Butler*, 77 Va. App. at 127.[11]

---

[11] In addition, contrary to Landlord's argument, Urbina presented evidence at trial of the presence of mold before April 2019.  Urbina introduced a July 2018 invoice from Diamond Enterprises that noted "molded [and] mildewed tiles."

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.  However, we remand this matter to the trial court for the limited purpose of correcting the clerical error noted on the jury trial order and the final judgment order.  *See* note 1, *supra*

*Affirmed and remanded.*