COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Causey and White
Argued at Alexandria, Virginia


FRIENDS HEALTH CARE TEAM, INC.
                                                    MEMORANDUM OPINION* BY
v.        Record No. 1126-24-4                      JUDGE RANDOLPH A. BEALES
                                                    DECEMBER 16, 2025
YOUNGS HEALTHCARE, INC.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge[1]

Richard F. MacDowell, Jr. (MacDowell Law Group, P.C., on briefs),
for appellant.

J. Chapman Petersen (Federico J. Zablah; Chap Petersen &
Associates, PLC, on brief), for appellee.


Friends Health Care Team, Inc. ("Friends") appeals from the judgment of the Circuit Court

of Fairfax County finding that Friends tortiously interfered with the business expectancy of Youngs

Healthcare, Inc. ("YHC") and awarding $299,376 in compensatory damages and $275,000 in

punitive damages to YHC.  On appeal, Friends challenges the sufficiency of the evidence to support

the award of the $299,376 in compensatory damages and the $275,000 in punitive damages.

BACKGROUND

YHC and Friends are competing healthcare businesses.  Both companies provide home care

services to elderly and disabled individuals and operate senior day care centers in Annandale,

Virginia.  The businesses employ teams of employees who provide both home care and adult day

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge Bernhard, who is now a member of this Court, had no role in the hearing or
decision of this appeal.

care services.  To provide home care services, employees visit clients at home to provide services such as personal care and physical therapy.  To perform adult day care services, employees operate a location where elderly clients can spend the day and receive assistance, meals, and medical care as needed.  Both businesses serve elderly clients in the Korean-speaking community, many of whom are eligible for Medicaid-funded services.

YHC began its home care business in 2011 and opened its day care for seniors in 2016.  Its employees included Dae J. Yi, Hyunsook Leeim, Chung H. No, Yonghak Lee, and Jong Hoon Kim—among others.  Dae J. Yi, Hyunsook Leeim, Chung H. No, and Yonghak Lee each signed a "Confidentiality and Non-Competition Agreement" with YHC.  The agreement stated the following:

> During the course of employment and for a twelve month period thereafter the Employee is prohibited from engaging in any of the following: induce any employee of the Agency to resign, encourage any client or entity to discontinue any relationship with the Agency, solicit any client of the Agency (current and within the past twelve month period), enter into competitive employment or seek to provide competitive services while employed within twenty-five miles of any office of the Agency, or solicit referrals or opportunities from any referral source.

Friends began its home care business in 2013.  In November 2018, Friends opened its day care for seniors in a church building less than four miles away from YHC's senior day care center.  In the fall of 2018 leading up to the opening of the day care center, Friends' owner and CEO, Rebecca Cho, hired a "starting team" of employees to help initiate and operate Friends' day care business.  Friends' "starting team" included Dae J. Yi, Hyunsook Leeim, Chung H. No, Yonghak Lee, and Jong Hoon Kim.

Rebecca Cho and the "starting team" held meetings in which they discussed strategies to bring clients over from competing healthcare businesses, including YHC.  Jong Hoon Kim testified that "[s]ince there was a shortage of people because it [Friends day care] was in the beginning

stages," they would discuss "how to bring people in" from competing businesses, including YHC. He also testified that Rebecca Cho told him to bring clients from YHC.[2] Jong Hoon Kim recalled visiting one YHC client named In Su Lee. He explained that he "went to visit that apartment first, but things didn't go through, so I do know that Yi, Dae -- Dae J. Yi and Hyuns[oo]k Leeim also followed up."

YHC's CEO, Young Shin Lee, testified that after the "starting team" left YHC for Friends, she learned that YHC's clients were being contacted by former YHC employees who had gone to Friends. "When they open the business, a lot of the clients are getting calls from their -- our previous employees and they left, transferred to Friends." She explained that she received transfer forms from her former clients that were sent to her by Friends.[3] In total, Young Shin Lee estimated that Friends' employees called "almost 100 -- 70, 80 people I had at the time." Young Shin Lee faxed a letter to Friends' office in December of 2018 asking them to "stop doing soliciting" because it was "against the DMAS law that you cannot solicit a patient directly like door to door or phone calls or direct mailing."[4] YHC also sent "certified mail to our previous employees that they have to stop doing that too" because those former employees signed confidentiality and non-competition agreements when they worked for YHC.

---

[2] Contrary to Jong Hoon Kim's testimony, Rebecca Cho and each of the individual defendants testified that they did not solicit anyone from YHC and that they did not instruct anyone to solicit clients from YHC. Furthermore, Yonghak Lee and Dae J. Yi also testified specifically that Rebecca Cho never gave them such instructions.

[3] Young Shin Lee first stated that she did not have any written proof that her clients had been solicited by Friends. "Nobody would write it down. They were -- they just telling me." However, she later stated that her clients "actually showed me the text message they got" and that she personally witnessed her clients receiving calls from Friends. When asked by Friends' counsel whether she had "those records here today," Young Shin Lee said that she did not "have it with me right now. I think I had it somewhere."

[4] "DMAS" is an acronym for the Virginia Department of Medical Assistance Services, which oversees the administration of federal Medicaid funding in Virginia.

On June 4, 2019, in the Circuit Court of Fairfax County, YHC sued Friends Health Care Team, Inc.; Dae J. Yi; Hyunsook Leeim; Chung H. No; Yonghak Lee; and Jong Hoon Kim.[5] Against the individual defendants, YHC alleged breach of contract and conspiracy under Code § 18.2-499 and Code § 18.2-500. Against Friends Health Care Team, Inc., YHC alleged tortious interference with a contract and with business expectancy as well as conspiracy under Code § 18.2-499 and Code § 18.2-500.

Trial began on October 24, 2022. During trial, Young Shin Lee tried to explain the amount of money that YHC lost due to Friends' alleged interference in YHC's business. She testified that YHC earned income by filing reimbursement claims with the medical insurance companies of its clients and that these insurance companies provided payment for services that were administered via Medicaid and DMAS. She also testified that YHC would receive reimbursements from its clients' insurers each month because she completed her billing on a monthly basis. At first, when asked by her counsel what "the average monthly reimbursement" amount was "[f]or senior daycare services," Young Shin Lee stated that "[i]t was a little over 1,600. 1,600 something." When asked for clarification by the circuit court judge, Young Shin Lee's counsel explained that they were providing "a rough estimate."

---

[5] YHC also sued Mikyoung Kim, Soon Im Lee, and Meehyun Leepark. On April 27, 2020, YHC filed an amended complaint that removed Jong Hoon Kim and added Friends Adult Day Care, Inc., alongside the other named defendants. However, when the jury entered its verdict in this case, it only did so as to Friends Health Care Team, Inc., Dae J. Yi, Hyunsook Leeim, Chung H. No, and Yonghak Lee. When Friends Health Care Team, Inc., appealed the jury's verdict, this Court dismissed that appeal without prejudice as an impermissible appeal of an interlocutory order because the claims against Mikyoung Kim, Soon Im Lee, Meehyun Leepark, and Friends Adult Day Care, Inc., remained unresolved. *See Friends Health Care Team, Inc. v. Youngs Healthcare, Inc.*, No. 0618-23-4 (Va. Ct. App. Apr. 8, 2024) (order). The circuit court then entered a final judgment dismissing with prejudice the claims against Mikyoung Kim, Soon Im Lee, Meehyun Leepark, and Friends Adult Day Care, Inc. That dismissal is not at issue on appeal.

Her counsel then had her review the remittance letters that YHC received from its clients' insurers. She explained that these documents are what YHC used to receive reimbursements for the services it provided to its clients. Her counsel then asked Young Shin Lee if she could provide "the precise number of the loss that occurred to Youngs Healthcare." In response, Young Shin Lee said:

> So 17 times -- oh, it was exactly in the -- in the remittance letter. It's $1,663.20 per month. So 1,663.20 times 17 per month -- per month times 12 month[s] is -- make year. And about $500 average -- $500 per month profit for 17 people times 12 month[s]. I mean, I think that would be [the] total.

Her counsel then asked Young Shin Lee if she could "run down the numbers on your own real quick," to which Young Shin Lee replied:

> [Young Shin Lee:] I need a phone to calculate it.
>
> Mr. Petersen [(YHC counsel)]: How about a calculator?
>
> Ms. Uh [(YHC counsel)]: Your Honor, may I hand the calculator to the witness?
>
> The Court: Yes, through the deputy.
>
> [Young Shin Lee:] Thank you. So for the adult daycare center it's about [$]339,292 per year for 17 people. And I'll say [$]102,000 -- $102,000 for home care, approximately, per year.

Young Shin Lee also testified that the $339,292 and $102,000 were profits earned by YHC—not just revenue numbers. However, Young Shin Lee provided the same numbers when asked by her counsel to "talk about the revenues" and to give "the precise number of the loss that occurred to Youngs Healthcare."

The remittance letters submitted by YHC included services that YHC provided to 15 of the 17 clients that YHC claims that it lost to Friends, covering several months in 2018 and 2019. The remittance letters do not describe the nature of the services provided, nor do they specify whether the payments were for home care or day care services. They also include highly varying reimbursement amounts. For example, the remittance letters include a one-month charge of

- 5 -

$677.60 relating to one of the clients that YHC allegedly lost to Friends but also include a one-month charge of $4,679.76 (a combination of two payments) for another one of the YHC clients purportedly lost to Friends.

Young Shin Lee also testified that the 17 lost clients paid for adult day care services as well as for home care services. However, when asked by her own counsel whether the "17 were also home care clients," Young Shin Lee said:

> [Young Shin Lee:] Yes. Uh-huh.
>
> [Ms. Uh (YHC counsel):] Is that -- is that accurate?
>
> [Young Shin Lee:] I think so.
>
> [Ms. Uh (YHC counsel):] Okay. So patients can use both services?
>
> [Young Shin Lee:] Both service. Oh, if you want to separate it, I mean, I guess like 17 -- 16. I don't -- I didn't separate it, so I don't remember exactly, but about 16 they share both service. But four, five, they only using one service, maybe.

Young Shin Lee testified that the monthly reimbursement amount that YHC received for home care services "depends on how many hours they [the clients] get service" and that she "just average[s] it out." She explained that when she "calculate[d] it last time I say they do like 40 hours, 50 hours per -- per week. Then usually about 4- -- 500 per month." Young Shin Lee thus concluded that "[t]he profit is 500 per month" per client for home care services.

During cross-examination, counsel for Friends asked Young Shin Lee about her damages calculations. When asked whether there was "any guarantee that any particular patient would be with you [YHC] for up to a year," Young Shin Lee said that "not a lot of people" usually leave YHC because "they just like us." However, Young Shin Lee also testified that she did not know how many of the 17 clients allegedly lost to Friends were even still alive.

Dae J. Yi testified about what happened to YHC's lost clients after they came to Friends. He explained that three of the clients that YHC had lost to Friends had since passed away, seven had

- 6 -

already left Friends, one was no longer receiving day care services, and one was his own mother.[6] Dae J. Yi could not confirm the status of three of the other clients that YHC had allegedly lost to Friends. In sum, Dae J. Yi confirmed that 2 of the 17 clients were still receiving day care services from Friends, 3 had passed away, 7 had already left Friends, 1 was no longer receiving day care services, 3 had unconfirmed statuses, and one of the allegedly lost clients was his own mother.[7]

One of the former clients still receiving day care services from Friends at the time of trial was In Su Lee. He was also the only one of the 17 clients YHC claimed to have lost to Friends who testified at trial. In Su Lee testified that no one from Friends asked him to come to the Friends Day Care Center. Instead, he testified that he left Youngs because it "was kind of a small facility, and I felt always kind of crowded." When he went to look at Friends, "it was really big and nice, so I moved." He explained that he continues to receive day care services from Friends because he "feel[s] very comfortable there, so I'm staying there."

Counsel for Friends moved to strike YHC's three claims at the conclusion of YHC's case-in-chief and again at the conclusion of all the evidence. Both times, the circuit court denied the motion as to the breach of contract and tortious interference claims and took it under advisement as to the conspiracy claim.

In its closing argument to the jury, YHC asked the jury for $451,292 in compensatory damages, representing 1 year of lost profits for 17 day care clients (allegedly totaling $339,292) and

---

[6] Notably, Dae J. Yi testified that one of the 17 clients that YHC had allegedly lost to Friends had actually returned to YHC before passing away. He stated that Ki Han Yun "stayed just a short while, and then that person went back to Youngs" and that "she passed away now. I've heard that she passed away."

[7] Indeed, during the hearing on Friends' motion for judgment notwithstanding the jury's verdict, counsel for YHC stated that "at one point we -- we subtracted one" of the allegedly lost clients "because it was the mother of one of the defendants." Nevertheless, YHC's counsel still argued that "regardless, that was 16 persons that represented revenue where already the sunk costs are invested."

17 home care clients (allegedly totaling $102,000).[8] YHC's counsel explained that "we asked her [Young Shin Lee] on the witness stand, [w]hat is the net profit that would be associated with the loss of those 17 clients?" Counsel for YHC then said that "the aggregate was $339,292 a year of lost income from losing those 17 clients" and that this number "was for the adult day care where she [Young Shin Lee] got the certain sum for the adult day care." He also said that Young Shin Lee "had clients that were in the nursing care" and that "the net profit for those—again, those lost 17" when "added up is 102,000." He concluded by stating that "the total net profit that she lost, as a result of this incident, was 451,292 for one year." YHC also asked for punitive damages.

The jury ruled in favor of YHC on its breach of contract claims against each of the individual defendants and awarded a total of $200. The jury also ruled in favor of YHC on its tortious interference claim against Friends. The jury awarded YHC $299,376 in compensatory damages and $275,000 in punitive damages, with prejudgment interest from June 1, 2019. However, the jury ruled against YHC's conspiracy claim.

On November 17, 2022, counsel for Friends filed a motion for judgment notwithstanding the jury's verdict and a motion to set aside the jury's verdict and to grant a new trial or, in the alternative, to grant remittitur of the compensatory and punitive damages awards. Following a March 10, 2023 hearing—and by order entered on the same day—the circuit court denied Friends' post-trial motions. Friends now appeals to this Court.

ANALYSIS

On appeal to this Court, Friends raises ten assignments of error. However, this Court first (and primarily) addresses Friends' fifth assignment of error, which is the assignment of error that

---

[8] While YHC's counsel stated that "we're looking at a compensatory damage of 451,292," he only asked the jury to award "$339,292 a year of lost income from losing those 17 clients" along with $102,000 for "clients that were in the nursing care." The sum of $339,292 and $102,000 only amounts to $441,292.

is most important in deciding this appeal.  In that assignment of error, Friends argues, "The Circuit Court erred when it failed to grant Appellant's motion to strike the Appellee's claim for tortious interference with business expectancy where there was no proper means for the jury to calculate compensatory damages, without precise evidence of Appellee's profit margin from each contract."

"[W]here the trial court has declined to strike the plaintiff's evidence or to set aside a jury verdict," this Court considers on appeal "whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff." *Parson v. Miller*, 296 Va. 509, 523-24 (2018) (alteration in original) (quoting *Bitar v. Rahman*, 272 Va. 130, 141 (2006)).  In reviewing the sufficiency of the evidence, we view it "and all reasonable inferences fairly deducible from it in the light most favorable to the prevailing party at trial." *Colas v. Tyree*, 302 Va. 17, 26 (2023) (quoting *Xspedius Mgmt. Co. of Va., L.L.C. v. Stephan*, 269 Va. 421, 425 (2005)).  Thus, in this appeal, we must view the evidence in the light most favorable to YHC because YHC is the party that prevailed below in the trial court. Viewing the evidence in this light, we give the non-moving party "the benefit of all substantial conflict in the evidence." *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)).  The Supreme Court has also repeatedly emphasized, "However, 'it is just as obligatory upon the appellate court, to set aside . . . the judgment of a court, when it is, in its opinion, contrary to the law and evidence, and therefore plainly wrong, as it is to sustain it when the reverse is true.'" *Preston v. Commonwealth*, 281 Va. 52, 57 (2011) (alteration in original) (quoting *Hickson v. Commonwealth*, 258 Va. 383, 387 (1999)).

"A trial court should not sustain a motion to strike 'in any doubtful case.'" *Boyette v. Sprouse*, 79 Va. App. 558, 573 (2024) (quoting *Walton v. Walton*, 168 Va. 418, 422 (1937)); *see also Costner v. Lackey*, 223 Va. 377, 381 (1982) ("A motion to strike is in effect a motion for

summary judgment which is not to be granted if any material fact is genuinely in dispute."). "When evaluating a motion to strike, the circuit court must not judge the weight or credibility of evidence, because to do so 'would invade the province of the jury.'" *Dill*, 300 Va. at 109 (quoting *Tahboub v. Thiagarajah*, 298 Va. 366, 371 (2020)).

The elements of a claim for tortious interference with a business expectancy are "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 (2014) (quoting *Chaves v. Johnson*, 230 Va. 112, 120 (1985)). Thus, as the Supreme Court has told us, since a plaintiff claiming tortious interference with a business expectancy must prove "damage to the party whose relationship or expectancy has been disrupted," *id.* (quoting *Chaves*, 230 Va. at 120), failure to prove damages is a failure to prove the claim. *See Collelo v. Geographic Servs.*, 283 Va. 56, 75-76 (2012) (where the Supreme Court held "that the trial court did not err in striking" the appellee's "tortious interference with a contract claims" because "the evidence was insufficient to" prove that the appellee "incurred damages as a result of Autometric's and/or Boeing's tortious interference with a contract").

YHC "had the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted." *Banks v. Mario Indus. of Va., Inc.*, 274 Va. 438, 455 (2007) (quoting *Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177, 188 (2006)). As the Supreme Court has often stated, "When an established business, such as [YHC], is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business by reason of the wrongful act, measured by the loss of the usual profits from the business." *Id.* (quoting *Saks Fifth Ave., Inc.*, 272 Va. at 188). Indeed, binding Supreme Court caselaw holds that "prospective

- 10 -

profits are not recoverable *in any case* if it is uncertain that there would have been any profits, or if the alleged profits are so contingent, conjectural, or speculative that the amount thereof cannot be proved with a *reasonable degree of certainty*." *Saks Fifth Ave., Inc.*, 272 Va. at 188-89 (emphases added) (quoting *Sinclair Refining Co. v. Hamilton & Dotson*, 164 Va. 203, 211 (1935)). Not only must the plaintiff show that it lost prospective profits, but it must also show that the loss of those profits was "the direct and proximate result" of the wrongful conduct. *Banks*, 274 Va. at 455 (quoting *Saks Fifth Ave., Inc.*, 272 Va. at 188). Thus, to recover damages for lost profits, YHC had to (1) "show a causal connection between the defendant's wrongful conduct and the damages asserted," and (2) "prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Saks Fifth Ave., Inc.*, 272 Va. at 189; *accord Banks*, 274 Va. at 455.

In short, under controlling and binding Supreme Court caselaw, the evidence provided by YHC in support of its compensatory damages claim is simply not what is needed to justify the jury's award of damages in this case. In *Boggs v. Duncan*, 202 Va. 877, 878-79, 883 (1961), the Supreme Court overturned a jury verdict that had awarded compensatory damages to the defendant on the defendant's cross-claim after the plaintiff prevented the defendant from performing a contract to sell timber. In support of his damages calculation, the defendant said "that if he had been allowed to cut all of the timber he 'would have made a profit'" of $6,000. *Id.* at 883. The defendant also had a witness testify on his behalf who stated that the defendant "should have made a profit thereon of $6,000." *Id.* Nonetheless, the Supreme Court concluded that there was "no evidence upon which the alleged loss of profits can be ascertained or calculated with reasonable certainty" because there was "no showing as to the estimated cost of removing the remaining timber on the land, the price or prices at which it might probably be sold, the expenses of such sale, and the net profit to be derived from the operation." *Id.* at

883-84. The Court noted, "We have merely the opinion of the defendant himself, supported by that of another witness, that the defendant would or should have made a profit of $6,000 had he been permitted to complete the contract." *Id.* at 884. "Such opinions, unsupported by any data, facts or figures upon which they are based, are insufficient to prove with the required certainty the alleged loss of profits." *Id.*

Similarly, in *ADC Fairways Corp. v. Johnmark Constr., Inc.*, 231 Va. 312, 316-18 (1986), the Supreme Court concluded that the plaintiff construction company failed to prove lost profits from a contract to renovate apartments for the defendant where the plaintiff failed to provide the necessary evidence to support the plaintiff's asserted profits from the uncompleted project. The president of the plaintiff company estimated the lost profits using the number of units called for in the contract, the price per unit, and an estimated profit margin of 15%. *Id.* at 317. "He said, on direct examination, that the units were to be rehabilitated for a price of $2,562.50 per unit," "computed '[a]pproximately 15 percent' of the $2,562.50 as profit," and testified that "the contract called for the completion of 171 units." *Id.* (alteration in original). He thus calculated his lost profits "by taking 15% of $2,562.50 and multiplying that number by 171." *Id.* The company president also "admitted that in making his per unit bid for the" project that "he '*estimated* expenses.'" *Id.* (emphasis in original). The Supreme Court reversed the circuit court's grant of lost profits because "[t]hey were completely speculative" and because the values provided by the president were "nothing more than the profit Johnmark hoped to make." *Id.* at 318.

In this case, YHC tried to prove its lost profits by offering the testimony of its CEO, Young Shin Lee, along with a selection of remittance letters showing payments that YHC had received in the past for work performed for the clients it claims to have lost to Friends. The remittance letters only included services that YHC performed for 15 of the 17 allegedly lost

- 12 -

clients and recorded a wide range of monthly charges, including a charge of $677.60 relating to one of the clients and a charge of $4,679.76 for another one of the clients. The remittance letters also did not list the services that YHC performed, including whether the charges were for home care or adult day care services. Therefore, just as in *Boggs*, YHC failed to provide reliable "evidence upon which the alleged loss of profits can be ascertained or calculated with reasonable certainty." 202 Va. at 883.

Despite these inconsistencies, Young Shin Lee testified that "the average monthly reimbursement" amount "was a little over 1,600. 1,600 something." However, when asked by her own counsel to provide "the precise number of the loss that occurred to" YHC, Young Shin Lee had to ask for an iPhone and use a calculator in order to calculate what she then claimed to be the total amount of compensatory damages—while sitting up on the witness stand. When using the calculator, she settled—without any real explanation—on $1,663.20 as the average monthly reimbursement amount earned by YHC for the services performed for each client. In other words, when asked by her own counsel whether she could "run down the numbers on your own real quick," and provide the jury with the aggregate amount of money that YHC claimed to have lost due to the interference of Friends, Young Shin Lee had to actually physically calculate the total amount of money that YHC had allegedly lost while she was sitting on the witness stand in front of the jury.

Despite Young Shin Lee's testimony, only 2 of the charges appearing in the over 30 pages of remittance letters for services that YHC performed for the clients that YHC claims to have lost to Friends are for exactly $1,663.20. Moreover, Young Shin Lee then multiplied her claimed average monthly reimbursement amount ($1,663.20) by 17 to calculate the total monthly reimbursement amount that YHC purportedly would have earned from its 17 clients that it claims were improperly taken by Friends. However, the remittance letters only list services that YHC

performed for 15 clients—not 17 clients—as well as many remittances for clients who YHC admits were not lost to Friends. In addition, Young Shin Lee provided no explanation for her testimony that YHC also earned an average of $500 a month for home care services from each of the same 17 clients that Friends allegedly took from YHC. Rather, she said that the amount of money earned by YHC for home care services "depends on how many hours they [the clients] get service" before she concluded that each client received "like 40 hours, 50 hours per -- per week. Then usually about 4- -- 500 per month." Young Shin Lee also did not explain why she provided the exact same numbers in response to questions from her own counsel when asked about both the *profits* YHC would have earned from the 17 lost clients and also about the *total revenue* that YHC would have earned from the 17 lost clients.[9] Nor could Young Shin Lee corroborate her own testimony that the 17 lost clients were paying for both home care and adult day care services. Indeed, Young Shin Lee seemed quite unsure herself whether the statements that she made were accurate, responding with "I think so" when asked by her own counsel whether the "17 were also home care clients." Moreover, when asked by her own counsel whether it was true that "patients can use both services," Young Shin Lee replied:

> Both service[s]. Oh, if you want to separate it, I mean, I guess like 17 -- 16. I don't -- I didn't separate it, so I don't remember exactly, but about 16 they share both service[s]. But four, five, they only using one service, maybe.

---

[9] A "profit" is the "excess of revenues over expenditures in a business transaction." *Profit*, *Black's Law Dictionary* (12th ed. 2024). A "revenue" is "[i]ncome from any and all sources; gross income or gross receipts." *Revenue*, *Black's Law Dictionary* (12th ed. 2024). Thus, unless there are no expenditures, a company's revenue and a company's profit cannot be the same thing. Counsel for YHC contended at oral argument before this Court that total revenue and profits were likely the same figure because YHC had essentially only fixed costs. However, this ignores the additional expenses for food and meals that would increase at the YHC Senior Day Care Center depending on the number of clients, and the increased expenses for gasoline and drivers and staff required to serve home care clients (and also to transport and look after the clients who are at the YHC Senior Day Care Center).

- 14 -

Finally, Young Shin Lee did not explain why she asked for a year of monthly payments for each of the 17 clients—especially when Dae J. Yi testified that three of the clients whom YHC had lost to Friends had since passed away—and that seven of the lost clients had already left Friends. Rather, Young Shin Lee simply testified that "not a lot of people" usually leave YHC because "they just like us."

Just like the losing plaintiff in *ADC Fairways*, Young Shin Lee sought to recover lost profits based on her own testimony and did so by relying on estimates. *ADC Fairways Corp.*, 231 Va. at 317. Moreover, Young Shin Lee calculated her actual lost profits number in almost exactly the same manner as did the unsuccessful plaintiff in *ADC Fairways*—with the *ADC Fairways* plaintiff "taking 15% of $2,562.50 and multiplying that number by 171" and Young Shin Lee multiplying $1,663.20 by 17 clients and again by 12 months—and then adding that number to $500 times 17 times 12. *Id.* Indeed, the testimony provided by YHC in support of its lost-profits claim here is even less reliable than the evidence at issue in *ADC Fairways* because (1) Young Shin Lee's testimony is in part contradicted by the remittance letters (since they provide values different than those testified to by Young Shin Lee), (2) Young Shin Lee assumed that all 17 of the purportedly lost clients would have remained with YHC for a year without knowing whether the 17 clients were actually even still living, and (3) Young Shin Lee was so uncertain of her losses that she actually had to ask for an iPhone and use a calculator to calculate her yearly estimated lost profits while sitting on the witness stand. Such scant and inconsistent evidence simply is not what is necessary—under binding Supreme Court caselaw—to justify the award of the compensatory damages awarded to YHC here.[10]

---

[10] Friends does not challenge on appeal the jury's award of damages to YHC for the breach of contract claims that YHC brought against the other defendants here in the circuit court. Thus, the decision of this Court on appeal does not affect the jury's award of damages to YHC on its breach of contract claims.

"Damages are not rendered uncertain because they cannot be calculated with absolute exactness," but the plaintiff must at least provide "a reasonable basis of computation." *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 399-400 (2012) (quoting *Washington Golf & Country Club, Inc. v. Briggs & Brennan Developers, Inc.*, 198 Va. 586, 592 (1956)). For all of these reasons noted *supra*, YHC has provided essentially no "reasonable basis of computation" to calculate the profits it claims to have lost to Friends. Likewise, YHC failed to provide the necessary evidence upon which the jury could make an intelligent and reasonable assessment of the damages YHC claims to have sustained—and then award almost $300,000 in compensatory damages (and $275,000 in punitive damages). Therefore, the circuit court erred by not granting Friends' motion to strike and Friends' later motion to set aside the verdict.[11]

CONCLUSION

For all of the foregoing reasons, the circuit court erred in denying the appellant's motion to strike and appellant's later motion to set aside the verdict. Therefore, we must reverse the decision of the circuit court, and we remand for the circuit court to enter an order consistent with this opinion.

*Reversed and remanded.*

---

[11] On brief to this Court, counsel for Friends argues that YHC's "own evidence does not support their entitlement to any compensatory damages" and that the circuit court thus "had a duty to evaluate the $275,000 punitive damages award." Because YHC did not provide the necessary evidence to show its lost profits—and therefore cannot recover any compensatory damages—YHC also cannot recover any punitive damages. "It is well-established that 'an award of compensatory damages . . . is an indispensable predicate for an award of punitive damages, except in actions for libel and slander.'" *Syed v. Zh Techs., Inc.*, 280 Va. 58, 74-75 (2010) (alteration in original) (quoting *Gasque v. Mooers Motor Car Co.*, 227 Va. 154, 159 (1984)).